CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 NOV 19 PM 4:06

DEPUTY CLERK _BMG_

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| GOLDEN SPREAD COOPERATIVE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| WESTPORT INSURANCE COMPANY, as | § | |
| Subrogee of Golden Spread Electric Cooperative | § | |
| | § | |
| Intervenor, | § | |
| | § | Case No. 5:17-CV-069-D-BQ |
| v. | § | |
| | § | |
| EMERSON PROCESS MANAGEMENT | § | |
| POWER & WATER SOLUTIONS, INC., | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to a Standing Order of Reference, this case has been referred to the undersigned

United States Magistrate Judge for pretrial management, including decisions as to non-dispositive

matters and making findings and recommendations as to dispositive matters. ECF No. 74. This

case, removed from state court based on diversity jurisdiction, arises out of a contract in which

Defendant Emerson Process Management Power & Water Solutions, Inc. (Emerson) agreed to

replace the distributed control system (DCS) for a steam turbine at Plaintiff Golden Spread Electric

Cooperative, Inc.'s (GSEC) power station. Emerson now moves for summary judgment on

GSEC's contract (breach of contract and express warranty) and tort (negligence and strict liability)

claims for damages allegedly sustained by the steam turbine as a result of defects in the DCS. *See*

Def. Emerson Process Management Power & Water Solutions, Inc.'s Mot. for Summ. J. (ECF No.

71) [hereinafter Def.'s Mot. Summ. J.]. For the reasons that follow, the undersigned recommends

that the District Judge **GRANT** Emerson's motion.

1

# I.    Background

GSEC operates Mustang Station Power Plant (Mustang Station), a consumer-owned power plant located near Denver City, Texas.  Mustang Station became operational in the year 2000, and has multiple generators capable of producing a combined 958 megawatts of power.  App. to Pl.'s Resp. to Def.'s Mot. Summ. J., at 1[1] (ECF No. 78) [hereinafter Pl. App.].  This litigation centers on one of those generators—an Alstom steam-turbine generator known as Unit 3—and a control system designed by Emerson.  GSEC purchased Unit 3 from Alstom and installed it in the Mustang Station during 1999–2000.  *Id.* at 2.

In 2013, GSEC solicited proposals to replace Unit 3's DCS, and Emerson submitted the winning bid.  Def. Emerson's Br. in Supp. of its Mot. Summ. J., at 8 (ECF No. 72) [hereinafter Def.'s Br.]; Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J., at 6–7 (ECF No. 77) [hereinafter Pl.'s Resp.].  GSEC and Emerson subsequently negotiated and executed a contract that required Emerson to design, develop, program, and install the new DCS for Unit 3.  Pl. App., at 2.  The DCS is "the necessary means for operation and control of the steam turbine's integrated subsystems" and includes "computer hardware, software and associated equipment."  App. to Def. Mot. Summ. J., at 2 (Decl. of Glen Wagner) (ECF No. 73) [hereinafter Def. App.].  Specifically, the executed contract requires, in part, that Emerson provide "control solutions that will target and analyze specific processes in Golden Spread's Mustang Station, determining optimal operating conditions and offering tremendous cost savings to Golden Spread's Mustang Station facility."  Pl.'s First Am. Compl., at 3 (ECF No. 36).  The contract encompassing the parties' agreement

---

[1] Page citations to the parties' briefing cites to the electronic page number assigned by the court's electronic filing system at the top of each page.  Page citations to the parties' appendices cite the master number affixed by the parties.

consists of four parts, numbered in their "order of precedence" for interpretation: (1) Cover Letter; (2) Proposal; (3) License Agreement; and (4) Terms and Conditions. Def. App., at 290.

During Emerson's testing and commissioning of the new DCS, Mustang Station lost power and Unit 3 tripped offline. Pl. App., at 2; Def.'s Br., at 9; Pl.'s Br., at 7. As Unit 3 coasted to a stop, the lube-oil system failed to remain engaged, which caused the turbine to overheat and suffer extensive friction damage. Def.'s Br., at 9; Pl.'s Br., at 7. Investigation after the incident revealed that the new DCS created and installed by Emerson for Unit 3 contained a logic error in the software that caused the lube-oil system to prematurely shut off during the turbine roll-down. Def.'s Br., at 9; Pl.'s Br., at 7.

Following the incident, and pursuant to the parties' agreement, GSEC submitted a warranty claim to Emerson. Def.'s Br., at 9–10. Emerson completed modifications to the DCS software, which GSEC subsequently approved, and GSEC returned Unit 3 to service. Def. App., at 2–3 ¶ 11 (Decl. of Glen Wagner). Emerson performed this warranty work at no charge to GSEC. Joint Stipulation of Facts, at 1 (ECF No. 98).

GSEC and Westport Insurance Company[2] filed this lawsuit in an attempt to recover damages for the injury sustained by Unit 3 due to Emerson's alleged improper design, development, programming, and installation of the replacement DCS. Pl.'s First Am. Compl., at 4–12. They seek $8,352,996.94 in damages for steam turbine repair costs caused by the lack of lubrication following the power failure. GSEC's Amended Complaint alleges claims for breach of contract, breach of express warranty, negligence, and strict product liability. *Id.* Emerson moves for summary judgment as to all claims. Def.'s Br., at 10–22.

---

[2] GSEC obtained an insurance policy from Westport Insurance Company (Westport) to cover risks associated with potential damage to Unit 3. Def.'s Br., at 10. Westport filed a Notice of Joinder of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment: for the purposes of these Findings, Conclusions, and Recommendation, the court will refer to both parties as GSEC. *See* ECF No. 79.

Emerson contends that GSEC's breach of contract and warranty claims fail as a matter of law because the parties' negotiated contract unambiguously provides that GSEC's sole and exclusive remedy is for Emerson either to correct any nonconformity or defect or, if impracticable, to refund the purchase price. Def.'s Br., at 11–13; Def. Emerson's Reply Br. in Supp. M. Summ. J., at 5–10 (ECF No. 83) [hereinafter Def.'s Reply]. Emerson further asserts that Texas's economic loss doctrine bars GSEC's tort claims as a matter of law. Def.'s Br., at 13–19; Def.'s Reply, at 10–15. Emerson also proffers alternative theories for granting partial or full summary judgment, arguing the parties contracted for a disclaimer of consequential or incidental damages arising from either contract or tort claims, and a total damage cap equal to the greater of the defective item's purchase price or $2.5 million. Def.'s Br., at 19–22; Def.'s Reply, at 15.

In response, GSEC argues that Emerson misinterprets the terms of the contract, and that the Limited Warranty provisions cited by Emerson are not the sole and exclusive contract remedies available. Pl.'s Br., at 10–13. In addition, GSEC contends the economic loss doctrine does not preclude recovery in this case because it bargained for the new DCS separately from the original turbine. *Id.* at 14–22. GSEC further asserts that the damage to Unit 3 was not consequential, but instead direct and foreseeable damage not limited by the contract. *Id.* at 22–24. Lastly, GSEC claims that the damages cap in the contract does not cover or apply to their claim for attorney's fees. *Id.* at 24–27.

## II.   Summary Judgment Standard

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" when it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" when

the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). In determining whether a dispute is "genuine," courts "consider all facts and evidence in the light most favorable to the nonmoving party[,] . . . draw all reasonable inferences in favor of the nonmoving party[,] . . . [and] disregard all evidence favorable to the moving party that the jury is not required to believe." *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013) (quotations and internal citations omitted).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden of proving such material facts at trial, movants may satisfy their burden by either affirmatively showing the nonmovant's inability to establish such material facts or "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it need not negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014). Once a movant fulfills its initial responsibilities, the nonmovant must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 325.

If the movant will have the burden of proof on a claim or defense at trial, it "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (quoting *Fontenot v. Upjohn*

*Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923–24 (N.D. Tex. 2009) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-CV-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007)).

### III.   Analysis

**A. Emerson's Motion**

This court's local rules require that a party seeking summary judgment must "on the first page [of its motion], under the heading 'summary,' *state concisely the elements of each claim or defense as to which summary judgment is sought . . . .*"  N.D. Tex. Local Civil Rule 56.3(a) (emphasis added).  The rule further provides that the party may satisfy this requirement "by stating in its motion that each of the required matters will be set forth in the party's brief."  Local Rule 56.3(b).  Emerson followed the latter course, referring the court to its brief for a summary of the grounds upon which it seeks summary judgment.  *See* Def.'s Mot. Summ. J., at 1; Def.'s Br., at 11–21.  While not a model of clarity, and certainly not "stat[ing] concisely the *elements of each claim or defense* as to which summary judgment is sought," the court gleans the following from Emerson's motion and brief.[3]  Because neither the motion nor brief identifies, much less examines, any summary judgment proof concerning the essential elements of GSEC's claim for breach of express warranty,[4] the court presumes Emerson does not seek judgment by either affirmatively

---

[3] Local Rule 56.3(b) allows a party to provide the required information anywhere in its brief, "as long as the party indicates in its motion that it is putting the necessary information in its brief." *Strong v. Green Tree Servicing, LLC*, Civil Action No. 3:14-CV-1027-B, 2016 WL 4095597, at *5 (N.D. Tex. Aug. 1, 2016) (citing N.D. Tex. Local Civil Rule 56.3(b)). Moreover, Federal Rule of Civil Procedure 83(a)(2) requires that a "local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." *Id.* (citing Fed. R. Civ. P. 83(a)(2)). There is no evidence before the court that Emerson's failure to comply with the strict letter of the law in Rule 56.3 was willful.

[4] *See Becker v. Cont'l Motors, Inc.*, 709 F. App'x 263, 267 (5th Cir. 2017) (quoting *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied)) (listing the six elements of a warranty claim under Texas law).

showing the nonmovant's inability to establish such material facts or "merely demonstrat[ing] an absence of evidentiary support in the record" as to the warranty claim. *See Wesley*, 660 F.3d at 213.

It does appear, however, that Emerson seeks summary judgment as to GSEC's contract, express warranty, negligence, and strict product liability claims as follows:

1. GSEC's breach of contract claim, as a general proposition, is subsumed within its express warranty claim by operation of Texas law;

2. Warranty and remedy limitations negotiated by the parties in the written contract bar GSEC's breach of express warranty claim;[5]

3. The economic loss rule bars tort claims for damage to the steam turbine because the DCS is an "integrated component" and the turbine therefore does not constitute "other property"; and

4. Even if the turbine qualifies as "other property" under the economic loss rule, its repair costs would be unrecoverable "consequential damages" or, if recoverable, subject to the contract's damage cap.

*See* Def.'s Br., at 6–8, 12 n.3. The court examines each claim as follows.

## B. The Summary Judgment Record Before the Court

Although GSEC asserts four separate causes of action, i.e., breach of contract, breach of express warranty, negligence, and product liability, its claims boil down to two common issues: did the DCS provided by Emerson contain a defect that caused damage to the Unit 3 turbine and, if so, what remedies, if any, does the parties' contract provide for such defect and the resulting damages? Before the court can properly evaluate Emerson's motion, it must first identify the summary judgment evidence in the record concerning these two questions.

As to the parties' negotiated agreement, both parties have submitted verified copies of the final version of the contract. *See* Def. App., at 289–382; Pl.'s First Am. Compl., Ex. A, at 1–94

---

[5] *See infra* note 8 for further explanation.

(ECF No. 37-1). While the parties clearly have differing interpretations of the contract, there appears to be no dispute over what documents actually make up the contract or the relevant language contained therein.

Regarding the incident itself, from the court's review of the parties' summary judgment filings (including the motion and supporting brief, response, and reply, all exhibits and appendices attached thereto, and the parties' joint stipulation), the parties agree factually as to what occurred—they simply disagree as to the resulting legal consequence. Apparently due to this lack of factual dispute, however, neither GSEC nor Emerson offers much in the way of traditional Rule 56 summary judgment proof—affidavits, deposition testimony, etc.—specifically identifying the cause of the injury alleged.[6] Identifying the defect causing the damages sought by GSEC is significant because the contract contains different language for defects related to Goods and Services and those associated with Software and, as argued by GSEC, potentially provides differing remedies for each. Because few, if any, of either party's factual recitations in the motion for summary judgment (MSJ) briefing concerning the specific cause of the DCS's failure and the resulting damage are submitted as sworn testimony, the court must consider the legal impact, if any, of the parties' unsworn factual statements contained in their MSJ briefs, as well as GSEC's factual allegations set forth in its First Amended Complaint (FAC), in determining whether to grant or deny Emerson's motion for summary judgment. For the reasons set forth below, the court

---

[6] The lone statement contained in any affidavit or sworn testimony that is even remotely material to the question of what caused the damage complained of by GSEC, and upon which Emerson seeks summary judgment, is the following, contained in the affidavit of J. Jolly Hayden, chief operating officer of GSEC: "On March 24 of 2015 while undergoing testing and commissioning of the control system Defendant installed, the Alstom Steam Turbine Generator suffered damages. An investigation by Golden Spread showed that the damage occurred due to the DCS supplied by Emerson pursuant to the contract filed as ECF 70-1." Pl. App., at 2, ¶ 7. Emerson cites, and the court finds, no proffered summary judgment evidence, other than references to Plaintiff's First Amended Complaint, on this issue. *See* Def.'s Br., at 8–9 (Emerson's "Factual Allegations"). For the reasons set forth below, however, this lack of evidence poses no impediment to granting Emerson's motion.

believes it can consider the following as admissible summary judgment evidence for the purpose of evaluating Emerson's motion.

First, a court may rely on judicial admissions contained in an opponent's response to an MSJ in deciding whether disputed fact issues exist. *See City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990) (refusing to treat as a "binding judicial admission" a misstatement in appellate brief addressing whether substantial evidence supports a jury verdict, noting that such a circumstance "is unlike admissions of fact in a summary judgment brief used to determine whether or not there is a genuine issue of material fact"); 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2723 (4th ed. supp. 2018) ("[A]dmissions in the brief of the party opposing the motion may be used in determining that there is no genuine dispute as to any material fact, since they are functionally equivalent to 'admissions,' which are expressly mentioned in Rule 56(c)(1)(A) . . . ."); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . admissions . . . ."). Second, following the same rationale, the Fifth Circuit has also stated that it "see[s] no reason why, for purposes of resolution of [a] motion for summary judgment," courts "cannot treat the factual allegations of the complaint as admissions or stipulations." *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 195 (5th Cir. 1988).[7] As a result, the court will examine both the parties' MSJ briefs and GSEC's FAC to determine whether any disputed material fact issues exist.

---

[7] In *Isquith*, the Fifth Circuit recognized that pleadings generally constitute summary judgment evidence only where a verified pleading meets Rule 56(e)'s stringent summary judgment affidavit requirements, e.g., is based on personal knowledge, states facts as would be admissible in evidence, etc. 847 F.2d at 194. Courts have applied this standard because "in those cases . . . the pleadings were being used to support summary judgment *in favor of the party who drafted them.*" *Id.* at 194–95 (emphasis added). Where, however, a defendant seeks to use a complaint's allegations *against* the plaintiff, i.e., to assume for purposes of the motion that plaintiff's factual allegations are true, a court may review the "motion for summary judgment supported by the factual allegations in plaintiffs' complaint," along with whatever other admissible summary judgment proof a defendant may offer. *Id.* at 195.

Based on the record before the court, it is abundantly clear the parties do not dispute that a "logic error" in the software of the DCS caused the alleged damages in this case. The court need look no further than GSEC's response to Emerson's motion to confirm this. *See, e.g.*, Pl.'s Br., at 7 ("Investigation . . . revealed the newly-purchased and installed DCS contained a logic error"), 11 ("[T]he instant dispute resulted from a defect in the DCS software."), 23 ("This list has no connection to direct property damage to the turbine occurring *as a result of Emerson's faulty DCS logic*." (emphasis added)). Emerson, at least for purposes of its motion, concurs in GSEC's assessment. *See, e.g.*, Def.'s Br., at 9 ("[T]he lube oil system failed to remain engaged because of a flaw in the programming of the steam turbine DCS"); Def.'s Reply, at 9 ("Golden Spread even acknowledges that its claims are for a defect in the control logic software. . . ."). Further examination of GSEC's live complaint removes any doubt as to what GSEC contends caused the damages it seeks to recover herein. *See, e.g.*, Pl.'s Am. Compl., at 8 ¶ 20 ("The DCS logic implemented by Emerson and controlling the lube oil system was defective in that it caused the lube oil system to fail to engage, resulting in overheating and friction damage to the steam turbine."), 9 ¶ 25 ("The DCS control logic programmed by Emerson was defective. A detailed review of the logic that Emerson installed in the DCS at the time of the event reveals an incorrect logic loop."), 11 ¶ 29 ("The DCS logic implemented by Emerson and controlling the lube oil system was defective in that it caused the lube oil system to fail to engage, resulting in overheating and friction damage to the steam turbine."). GSEC also provides testimony that meets the requirements of Rule 56(c)(4) through an affidavit from an engineering expert, attached to its FAC as Exhibit A, wherein he opines that "a detail review of the logic that Emerson had installed, in their DCS, at the time of the event shows incorrect control logic existed," which "directly contributed to the Mustang Station Steam Turbine damage." Pl.'s Am. Compl., Ex. A, at 2–3 ¶¶ 8,

12. In sum, the court finds that the summary judgment record firmly establishes that a "logic error" in the software of the DCS caused the alleged damages in this case.

Considering the foregoing, the summary judgment evidence also clearly proves GSEC accepted the DCS unit upon delivery, incorporating it into the Unit 3 turbine and then seeking repair or modification to the DCS unit when defects in the software surfaced (as opposed to returning it or revoking the acceptance). The undisputed evidence also demonstrates, as a general proposition, that once notified of the software issue, Emerson remedied the defect to GSEC's apparent satisfaction and at no cost to GSEC. Specifically, GSEC submitted a written "warranty demand for the failure of the control system installed by Emerson at Mustang Station pursuant to the Software License Agreement and Paragraph 5(e) of the Terms and Conditions of Sale . . . ." Def. App., at 5–6 (email from GSEC Chief Operating Officer (COO) J. Jolly Hayden, dated Apr. 14, 2015); Joint Stipulation of Facts, at 1. In response, Emerson worked with GSEC to remedy the defect by modifying the software, with no charge to GSEC. *See* Def. App., at 2–3 ¶ 11; *see* Pl.'s Am. Compl., Ex. A, at 3 ¶ 11 ("Following the March 25th event Emerson and the plant conducted a detail review of all of the logics in the Emerson DCS. Many changes were made including the removal of the faulty Auto Stopping Logic for the EM DC Pump."); Joint Stipulation of Facts, at 1. GSEC approved the modifications, then put Unit 3 back into service. Def. App., at 3. The court finds no evidence in the record showing GSEC disputes that Emerson remedied the DCS's defective software in accordance with the contract; instead, it contends that the contract, rather than providing an exclusive repair remedy, also authorizes recovery by GSEC for damage caused to the turbine as a result of the software defect. Pl.'s Resp., at 11–13.

The court will examine the parties' contractual bargain within the foregoing factual framework and determine the legal effect of the agreement as to GSEC's various claims against Emerson.

### C.    Contract-Based Claims

Emerson moves for summary judgment on GSEC's contract-based claims, i.e., breach of contract and breach of warranty. Emerson claims that it provided GSEC with its exclusive remedy for any breach of warranty when it made modifications to the DCS, thus enabling GSEC to ultimately return Unit 3 to service. The contract expressly provides that it is "formed and shall be construed, performed, and enforced under the laws of the State of Texas." Def. App., at 295 ¶ 15(d). Further, the parties do not dispute that Texas law controls in this diversity action. Def.'s Br., at 11, n.2; Pl.'s First Am. Compl., at 2 ¶ 5; *see Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1142 (5th Cir. 1992) (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)) ("Texas recognizes the right of contracting parties to agree to choice of law.").

### 1.    As a matter of law, GSEC has no breach of contract claim because it accepted the DCS.

Emerson asserts in its motion for summary judgment that GSEC's contract claims "are properly characterized as breach of warranty claims." Def.'s Br., at 12, n.3 (alleging that GSEC's contract claim is "properly characterized as [a] breach of warranty claim[]" based on the Texas Supreme Court's distinction between such claims based on buyer's acceptance of defective goods). GSEC does not address this argument in its brief.

The court initially observes that as a matter of law, breach of contract and breach of warranty are distinct claims with different remedies. *See A.O. Smith Corp. v. Elbi S.P.A.*, 123 F. App'x 617, 619 (5th Cir. 2005) ("Texas law forbids conflating breach of warranty and breach of contract[.]"); *Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2013

WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013) (noting Texas law distinguishes between breach of contract and breach of warranty claims based on whether or not the buyer has accepted the goods). "[T]he critical factor in whether the buyer has a breach of contract or a breach of warranty claim is whether the buyer has finally accepted the goods." *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.). A buyer who justifiably rejects goods or revokes his acceptance may recover remedies for breach of contract. *Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 310 (Tex. App.—Dallas 2006, no pet.). Conversely, "[t]he remedies for breach of warranty . . . are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner." *Sw. Bell. Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) (citing Tex. Bus. & Com. Code Ann. §§ 2.714, 2.711 (comment 1)).

Here, the evidence shows, and GSEC alleges nothing to the contrary, that GSEC did not reject or revoke acceptance of the DCS. Instead, GSEC asserts that (1) Emerson supplied and installed the defective DCS into its preexisting steam turbine (Pl.'s Resp., at 7, 10–13) and (2) after accepting the DCS, GSEC subsequently discovered defects in the DCS during testing and commissioning. *Id.* at 7. Rather than rejecting the DCS or revoking its acceptance, GSEC submitted a warranty claim to Emerson, and Emerson repaired the defect in the DCS. The undisputed summary judgment evidence before the court establishes that the basis of GSEC's contract claim is the allegedly defective DCS it accepted and had installed on Unit 3. Because GSEC accepted the DCS, it cannot maintain a breach of contract action and is limited to only a warranty claim. As a result, the undersigned recommends that the district judge grant summary judgment in favor of Emerson for GSEC's breach of contract claims. *See Orthoflex, Inc.*, 2013 WL 4045206, at *8 (granting summary judgment dismissing plaintiff's breach of contract action where it had accepted the products).

2.  **The summary judgment evidence demonstrates Emerson has complied with its warranty obligations under the contract and that Emerson is entitled to entry of judgment on GSEC's breach of warranty claims.**

   a.  **Under Texas law, Emerson has complied with its contractual obligations in regard to GSEC's warranty claim.**

Emerson asserts that GSEC's express warranty claim fails because Emerson provided GSEC with its exclusive remedy for any breach caused by DCS software errors when it corrected the defects under the contract's exclusive remedy provisions. Def.'s Br., at 6, 12; Def.'s Reply, at 6–8 (contained in both the License Agreement and the Terms and Conditions of Sale). In response, GSEC alleges that the remedies provided in the warranty sections of the License Agreement and Terms and Conditions are not the sole remedies available under the contract for claims based on defective software, and it has "not agreed to waive damage claims if Emerson damages our property or . . . breaches its confidentiality obligation." Pl.'s Resp., at 10. While GSEC bears the burden of proof on its warranty claims,[8] limitations of remedies in a warranty are affirmative defenses, not elements of GSEC's cause of action; as such, Emerson must establish "beyond peradventure all of the essential elements of the . . . defense."[9] *Orthoflex, Inc.*, 2013 WL 4045206,

---

[8] For the purpose of evaluating Emerson's motion, the court assumes GSEC can establish the necessary elements to recover under its breach of express warranty theory. *See Becker*, 709 F. App'x at 267. The court notes, however, Emerson argued at the hearing that the issue raised in its motion is GSEC's inability to establish an element of its claim, i.e., a breach of the express warranty, rather than Emerson proving an affirmative defense, i.e., limitation of remedy. The court believes the basis for Emerson's motion is more accurately classified as an affirmative defense; however, as explained herein, the summary judgment proof establishes either premise—Emerson complied with its contractual obligations under the warranty, or if it breached the warranty—in this case, by providing a DCS with defective software—it provided the limited remedy required following such a breach.

[9] As noted earlier, Local Civil Rule 56.3(a) requires that a party moving for summary judgment must identify the specific elements of either the claim or defense upon which it seeks judgment. These requirements "are not procedural niceties that have no relevance to the work of the court." *Page v. Unum Life Ins. Co. of Am.*, Civ. A 398CV0770D, 1999 WL 1000493, at *1 (N.D. Tex. Nov. 3, 1999). Instead, they give the court a "snapshot" of the motion before it, and apprise the court and opposing party of the basis upon which the movant is seeking summary judgment. *Id.* Compliance with the rule "can be as simple as stating in a negligence case that there is no evidence of causation, or in a discrimination case of pointing the court to the absence of genuine evidence of intentional discrimination." *Id.* Where, however, the movant bases its motion on an affirmative defense, it must identify and establish each element of the asserted defense.

at *2; *see Centex Homes v. Lexington Ins. Co.*, No. 3:13-cv-719-BN, 2014 WL 2718805, at *9 (N.D. Tex. June 16, 2014), *vacated in part on other grounds*, No. 3:13-cv-719-BN, 2014 WL 11515383 (N.D. Tex. Sept. 11, 2014) (citations omitted) (recognizing that party asserting affirmative defense "must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his favor," and noting that such standard imposes a "heavy" burden).[10]

In interpreting the contract under Texas law, and specifically its warranty provisions, the court's primary objective "is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Med. City Dall., Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008) (citing *Rodriguez v. W.O.W. Life Ins. Soc'y*, 145 S.W.2d 1077, 1080 (Tex. 1941)) ("When we ascertain the parties' intentions in a warranty, we look to well-established rules for interpretation and construction of contracts."). To accomplish this objective, courts examine the contract as a whole "in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc.*, 128 S.W.3d at 229 (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951)); *see also* Tex. Bus. & Com. Code Ann. § 2.316(a) ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other."). Moreover, under the "Four Corners Rule," the parties' intent must be "ascertained from the instrument as a whole and not from isolated parts thereof." *Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d

---

[10] Here, Emerson must show it complied with the limited remedy provided by contract, i.e., promptly correcting any defect in the software at its expense, to meet its burden. Def. App., at 293 ¶ 5(e); *see Orthoflex, Inc.*, 2013 WL 4045206, at *6, *8 (considering motion for summary judgment based on contract's limited express warranty, court examined evidence as to whether defendant complied with "the only remedy available under the express warranty," i.e., paying for repairs and return shipping on defective items). Of course, to prevail on its motion, Emerson must also prove its interpretation of the contract is correct and that the remedy in question is indeed the only remedy provided by contract.

783, 787 (Tex. App.—Dallas 2005, no pet.). When considering whether a contract is ambiguous, "[o]bjective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). The court therefore presumes "parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* at 764 (internal quotations and footnotes omitted). "A contract is not ambiguous merely because the parties disagree about its meaning . . ." (*id.* at 763); instead, it is ambiguous only if it is "reasonably susceptible to more than one meaning." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). The presence of ambiguity and interpretation of an unambiguous contract are questions of law. *See URI, Inc.*, 543 S.W.3d at 763; *J.M. Davidson, Inc.*, 128 S.W.3d at 229 ("Deciding whether a contract is ambiguous is a question of law for the court.").

Although Emerson and GSEC urge the court to adopt differing interpretations of the contract, particularly in regard to available remedies, neither party asserts that the contract is ambiguous. *See* Def.'s Br., at 11–13; Def.'s Reply, at 5–10; Pl.'s Resp., at 10–11. The contract at issue is comprised of four different documents that "are to be complementary and interpreted in harmony so as to avoid conflict . . . ." Def. App., at 290 (Offer). The contract also sets out a specific "order of precedence in interpretation" to be used "[i]n the event of any inconsistency, conflict, or ambiguity . . . (i) Cover Letter, (ii) the Proposal, (iii) License Agreement, and (iv) Terms and Conditions." *Id.*

Interpreting the contract as a whole and giving meaning to all its provisions, the court finds that the exclusive remedy provision for warranty claims based on defective software is not

reasonably susceptible to more than one interpretation and is therefore not ambiguous. *See Project Dev. Grp., Inc. v. Metro. Transit Auth. of Harris Cty.*, No. 07-96-0350-CV, 1998 WL 416131, at *4 (Tex. App.—Amarillo July 24, 1998, pet. denied) (finding contract unambiguous because it was only susceptible to one reasonable interpretation). Thus, entry of summary judgment may be appropriate. *See Weaver v. Metro. Life Ins. Co.*, No. 4:16-CV-957-Y, 2017 WL 6191643, at *3 (N.D. Tex. Dec. 6, 2017) (quoting *Tex. Instruments, Inc. v. Hyundai Elecs. Indus. Co., Ltd.*, 42 F. Supp. 2d 660, 669–70 (E.D. Tex. 1999)) ("Summary judgment is particularly appropriate in cases where the language of a contract is unambiguous and only the interpretation of the contract in light of state substantive law is in dispute.").

The contract's Terms and Conditions of Sale provide the following in regard to any defects found in goods or services provided by Emerson:

> If Buyer discovers any warranty defects with respect to the Goods manufactured by Seller (other than the firmware, which shall be subject to warranty claims under the Software License Agreement)[11] or Services and notifies Seller thereof in writing during the applicable warranty period (as set forth in this Section 5), Seller shall (i) correct any defects and errors in the Services by re-performing the same, and (ii) at Seller's option, either repair or replace that portion of the defective Good(s) manufactured by Seller. If despite Seller's reasonable efforts, a defective Good manufactured by Seller cannot be repaired or replaced, or a nonconforming Service cannot be re-performed, Seller will refund to Buyer the purchase price of such defective Goods/Services.

Def. App., at 293 ¶ 5(e) (Terms and Conditions of Sale). Because the undisputed summary judgment evidence shows that a "logic error" in the software of the DCS caused the alleged damages in this case, the court will first examine, as required by the express terms of the contract, the Software License Agreement (License Agreement) to determine the bargain struck by the

---

[11] The contract further defines "Software" as "any software program, firmware, or flash ROM licensed by EMERSON and delivered to Buyer under the terms of this Agreement, including, but not limited to, the EMERSON operating system software, application software, [and] machine readable media on which the Software is contained . . . ." Def. App., at 297 (Software License Agreement).

parties as to applicable warranties and the remedy provided for any breach thereof. The express warranty in the License Agreement provides that "the Software shall comply, in all material respects, with the technical specifications in the Documentation, [and] will be free from defects which materially affect its utility with respect to the intended purpose. . . ." Def. App., at 297. The License Agreement further specifies that:

> In the case of a nonconformity to the foregoing warranty and if EMERSON is notified in writing of such nonconformity . . . EMERSON shall be promptly remedied [sic][12] such non-conformity (at its expense), by correction in the medium originally supplied, or provision of a procedure to correct material errors. If such remedies are impracticable, EMERSON shall promptly refund to LICENSEE the purchase price for nonconforming Software. . . .

*Id.* In addition, the License Agreement also contains a clause entitled "LIMITATIONS OF REMEDIES," which provides as follows:

> The warranties set forth above *are the exclusive remedies with respect to any warranty claim relating to the Software* and shall be in lieu of all other warranties with respect thereto, whether statutory, express or implied (including all warranties of merchantability and fitness for purpose and all warranties arising from course of dealing or usage of trade). This License Agreement and the rights and obligations of the Parties hereunder shall be subject to the limitations set forth in Section 6 of the Terms and Conditions.

---

[12] Apparently believing the parties' intent is plain from the context and thereby not warranting discussion, neither party addresses this awkward phrasing ("EMERSON shall be promptly remedied such non-conformity (at its expense) . . . .") nor, more importantly, cites such language as evidence of ambiguity in the contract. The court agrees that this grammatical or typographical error creates no ambiguity. Under Texas law, a "typographical mistake *must* yield to the well-established doctrine that written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions, by perusing the entire document and to this end, *words, names, and phrases obviously intended may be supplied.*" *Park Place Motorcars Mid Cities Ltd. v. Affiliated FM Ins. Co.*, No. 3:09-CV-720-K, 2010 WL 2143667, at *3 (N.D. Tex. May 26, 2010) (emphasis in original) (quotation omitted) (citing *City of Galveston v. Galveston Mun. Police Ass'n*, 57 S.W.3d 532, 539 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

Construing the contract as a whole and the parties' intentions as expressed in the entirety of the "Remedies" clause, it is clear the parties intended this language to read "Emerson shall *promptly remedy* such non-conformity," and the court will interpret it as such in analyzing Emerson's motion. *See Dalmac-Shelton Fannin Farms, Ltd. v. Zurich Am. Ins. Co.*, No. 3:08–CV–0782–N, 2009 WL 10677403, at *5 (N.D. Tex. Mar. 30, 2009) (construing insurance policy as a whole, court read exclusion so as to omit the word "if" because this resulted in only reasonable construction of the wording in question); *Sanmina Corp. v. BancTec USA Inc.*, No. Civ.A. 399CV0665BC, 2001 WL 79953, at *3 (N.D. Tex. Jan. 9, 2001) (granting summary judgment on option agreement despite typographical errors in one paragraph that misidentified good and party involved, where parties' intent was clear from the contract as a whole and neither party presented evidence of actual confusion over the parties to or subject matter of the agreement).

*Id.* (emphasis added).[13]  To complete the loop, Section 6 of the Terms and Conditions provides in relevant part:

> In no event, regardless of the form of the claim or cause of action (whether based in contract, infringement, negligence, strict liability, other tort or otherwise), shall either party's liability to the other party and/or its customers *with respect to any claim arising in connection with this Agreement* exceed the greater of (i) price to buyer of the specific goods manufactured or services provided by seller giving rise to the claim or cause of action, or (ii) $2.5 million.

Def. App., at 293 ¶ 6(B) (Terms and Conditions) (emphasis added).

Emerson maintains that because it complied with the express terms of the License Agreement for remedying the DCS defect, GSEC has received all relief to which it is entitled under the contract.  Def.'s Br., at 12.  GSEC argues in response that while Emerson did repair or reprogram the DCS software, other language in the contract reflects the parties' intent to not limit GSEC to that sole remedy for a breach of the express warranty.  Pl.'s Resp., at 10–13.  The court agrees that Emerson fulfilled its obligation under the specific provision cited for remedying defects in the DCS unit's software.  As previously outlined, the undisputed summary judgment evidence establishes that GSEC submitted a written "warranty demand for the failure of the control system installed by Emerson at Mustang Station pursuant to the Software License Agreement and Paragraph 5(e) of the Terms and Conditions of Sale. . . ." Def. App., at 5–6 (email from GSEC COO J. Jolly Hayden, dated April 14, 2015); Joint Stipulation of Parties, at 1.  In response, Emerson worked with GSEC to remedy the defect by modifying the software at Emerson's expense; GSEC approved the modifications and put Unit 3 back into service.  Def. App., at 2–3 ¶ 11; *see* Pl.'s Am. Compl., Ex. A, at 3 ¶ 11.[14]  It is therefore clear that no disputed issue of material

---

[13] Section 6(A) of the Terms and Conditions provides a similar exclusivity provision, stating that "[t]he remedies of Buyer set forth in Section 5 [repair or refund] of this Agreement are exclusive remedies for all claims based on defective goods (other than software . . .) or services." Def. App., at 293.

[14] *See also* Def. App., at 7 (Decl. of Robert Yeager, Ex. A) ("GSEC appreciates the work Emerson already has done under this warranty claim and the cooperation Emerson has shown in addressing the damage caused by the controls

fact exists as to whether Emerson complied with the contractual remedy for a breach of express warranty claim based on defects in the software. Because the summary judgment proof proves, and GSEC does not dispute, that Emerson remedied the DCS's defective software in accordance with the warranty's terms, the record requires entry of judgment in Emerson's favor on GSEC's express warranty claim, absent the contract providing some additional remedy. *See, e.g., Purcel v. Advanced Bionics Corp.*, Civil Action No. 3:07–CV–1777–M, 2010 WL 2679988, at *10 (N.D. Tex. June 30, 2010) (granting summary judgment on express warranty claim where written warranty provided that its replacement policy was "in lieu of any other warranty," expressed or implied, and defendant proved fulfillment of policy by offering to replace the defective device under warranty).

### b. The parties' contract provides no other remedies for breach of warranty.

Having found that Emerson fulfilled the terms of the License Agreement by repairing the DCS to GSEC's satisfaction, the court must now determine whether as a matter of law the contract limits GSEC to this sole remedy for breach of express warranty, or whether the contract provides additional remedies, e.g., the recovery of monetary damages for injury to the turbine. The court finds that the parties' contract provides no other remedy.

With some exceptions not applicable here, parties may modify or disclaim warranties under the Texas Uniform Commercial Code (UCC). *See* Tex. Bus. & Com. Code Ann. § 2.316(d) (stating remedies for breach of warranty "can be limited . . . on liquidation or limitation of damages and on contractual modification of remedy"); *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 82 (Tex. 1977) (recognizing that the UCC "allows manufacturers to restrict their liability by

---

failure. GSEC is working with Emerson to return Mustang Station to service as quickly as possible. Obviously we are not waiving any rights GSEC has in this matter.").

the exclusion or modification of both implied and express warranties").[15]   As noted earlier, a

warranty disclaimer is an affirmative defense (*Great Am. Prods.*, 94 S.W.3d at 683), and the party

invoking it must establish all essential elements. *Orthoflex, Inc.*, 2013 WL 4045206, at *2. Parties

may also "limit or alter the measure of damages recoverable" under the UCC "by limiting the

buyer's remedies to return of the goods and repayment of the price or to repair and replacement of

non-conforming goods or parts," and such remedy "is the sole remedy" if it "is expressly agreed

to be exclusive . . . ." Tex. Bus. & Com. Code §2.719(a); *see Calloway v. Manion*, 572 F.2d 1033,

1038 (5th Cir. 1978) (examining Texas law, court upheld jury finding enforcing parties' agreement

that if horse was not suitable, plaintiff's sole remedy would be return of the horse and credit of

purchase money toward another horse); *Fredonia Broad. Corp., Inc. v. RCA Corp.*, 481 F.2d 781,

798–99 (5th Cir. 1973) (recognizing under Texas law seller's ability to "limit the buyer's warranty

to repair and replacement and thus limit liability").   Construction of a contract, however, in a

manner "which renders [a] specified remedy exclusive should not be made unless the intent of the

parties that it be exclusive is *clearly* indicated or declared." *Bifano v. Young*, 665 S.W.2d 536,

539 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.) (emphasis in original) (citations omitted);

*see also McCarty v. Montgomery*, 290 S.W.3d 525, 534 (Tex. App.—Eastland 2009, pet. denied)

(holding that in order for a termination provision to be construed as the exclusive remedy, it must

contain language either making termination the "sole" or "exclusive" remedy or expressly limiting

remedies to a discrete number of choices).

    Initially, the court notes that a plain reading of the contract supports the conclusion that the

remedy already provided by Emerson constitutes GSEC's sole relief as to a breach of warranty.

*See, e.g., URI, Inc.*, 543 S.W.3d at 764 (internal quotations and footnotes omitted) (holding that

---

[15] Unlike implied warranty disclaimers, the UCC does not require conspicuous language for waiver of express warranties. *See* Tex. Bus. & Com. Code Ann. § 2.316(b).

courts presume "parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise"). The language in the Limitation of Remedies clause expressly states that "[t]he warranties set forth above [repair or refund] *are exclusive remedies with respect to any warranty claim relating to the Software and shall be in lieu of all other warranties with respect thereto . . . .*" *See* Def. App., at 297 (License Agreement). The use of the term "exclusive" in the clause expresses the parties' intent to make either repair of the software defect or refund of the purchase price the sole remedies available for any warranty claim based on a defect in the software. *See, e.g., Crow-Billingsley Stover Creek, Ltd. v. SLC McKinney Partners, L.P.*, No. 05-09-00962-CV, 2011 WL 3278520, at *7–8 (Tex. App.—Dallas Aug. 2, 2011, no pet.) (holding that by using the terms "sole and exclusive remedy," the parties intended that recovery of earnest money was the only remedy, thus precluding a breach-of-contract action).[16]

To combat what appears to be the contract's rather straightforward language on this issue, GSEC relies on comments made by the parties during contract negotiations, as well as specific clauses or provisions found elsewhere in the final version of the executed contract. GSEC cites to extrinsic evidence concerning the Limitation of Remedy clause (section 6(A)) negotiated by the parties, arguing that commentary to the edits[17] demonstrates GSEC did not agree to waive damage claims "if Emerson damages our property or . . . breaches its confidentiality obligation." Pl.'s Resp., at 10. Even accepting its explanation as true, i.e., that GSEC requested an edit to Section 6 of the Terms and Conditions to allow for property damage claims against Emerson, GSEC's

---

[16] Interestingly, GSEC admits at one point in its Response that the License Agreement's Limitations of Remedies clause "states that the warranties set forth . . . are the exclusive remedies 'with respect to <u>any warranty</u> claim relating to the Software.'" Pl.'s Resp., at 12.

[17] Specifically, GSEC asserts that a comment from a red-line version of the contract proves "as a matter of law that the risk of property damage was allocated by the parties to Emerson." Pl.'s Resp., at 10.

expressed rationale behind the edit cannot inform the court's decision as to the contract's scope and meaning. Because the contract is unambiguous on its face (and the parties do not contend otherwise), "extrinsic evidence of subjective intent is inadmissible and has no effect." *Shaver v. Schuster*, 815 S.W.2d 818, 824 (Tex. App.—Amarillo 1991, no writ) (citing *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (Tex. 1941)); *see Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (affirming summary judgment on contract claim and finding that extrinsic evidence of parties' subjective intent is immaterial); *Noble Drilling Corp. v. Fulton*, No. 14-98-01063-CV, 2001 WL 224739, at *5 (Tex. App.—Houston [14 Dist.] Mar. 8, 2001, pet. denied) (stating that "[a]n unambiguous contract renders immaterial any extrinsic evidence of the parties' subjective understanding and intent regarding the meaning of the contract"); *Corman v. Lifecare Acquisitions Corp.*, No. Civ. A. 3:96-CV-0755-D, 1998 WL 75908, at *2 (N.D. Tex. Feb. 10, 1998) (citing *Friendswood Dev. Co.*, 926 S.W.2d at 283) ("An unambiguous contract renders extrinsic evidence of the parties' subjective understanding and intent inadmissible."). Interpretation of the parties' intent as expressed in the Limitation of Remedies' exclusivity clause therefore stands or falls solely on the language contained therein, as construed in conjunction with the entirety of the contract. As a result, the court will next examine GSEC's arguments in regard to language of the contract itself.

GSEC contends initially that (1) the Limited Warranty section (Section 5) of the Terms and Conditions (goods and services), specifically 5(h),[18] operates only as a disclaimer of additional warranties for goods and services, not as a proscription against all claims for property damage and,

---

[18] Section 5(h) provides as follows: "The warranties and remedies set forth in this section 5 above are exclusive remedies for all claims based on defective goods (other than software, including firmware, which is covered by the Software Licensee [sic] Agreement) or services, and there are no other representations or warranties of any kind, express or implied, including as to merchantability, fitness for particular purpose or any other matter, with respect to any of the goods or services." Def. App., at 293 ¶ 5(h).

23

apparently in the alternative,[19] (2) Section 5's limited warranty language has no bearing on GSEC's claim because it specifically excludes claims based on defective software. Pl.'s Resp., at 11. GSEC also makes a related argument concerning language in the License Agreement, asserting that its terms pertaining to software only waive additional warranties of fitness and merchantability and do not constitute a disclaimer of any other claim or cause of action GSEC may have related to defective software. *Id.* at 13. In support of this construction, GSEC refers to the License Agreement's language specifying that "the rights and obligations of the Parties hereunder shall be subject to the limitations set forth in Section 6 of the Terms and Conditions," and that Section 6's damages cap (limiting each party's liability to the greater of the price to buyer of the good or service provided or $2.5 million) would be superfluous if it did not apply to other property damage claims arising out of defective software. *Id.* at 12. Finally, GSEC claims that language in the Cover Letter, which holds the highest priority in the documents forming the contract, contains another express warranty from Emerson concerning the DCS, and that this warranty "contains no limitations and was breached by [Emerson's] conduct." *Id.* at 13.

GSEC's foregoing arguments focus primarily on two sections of the contract, both of which are contained in the Terms and Conditions. Essentially, GSEC seems to allege first that Section 5's language providing that the warranties and remedies contained therein "are exclusive remedies for all claims based on defective goods (other than software . . . which is covered by the Software Licensee [sic] Agreement) . . . and there are no other representations or warranties of any kind," in no way bars its express warranty claim for damage to the turbine because the language: (1) only operates as a disclaimer of additional warranties for goods and services, not for claims of property

---

[19] Stated alternatively, if Section 5 has no relevance to GSEC's warranty claim because it specifically excludes claims based on defective software, then the scope of its limitation, i.e., either as a disclaimer of additional warranties or a prohibition of other claims, is also irrelevant.

damage; or (2) by its express terms specifically excludes from its coverage claims based on defective software.

Regardless of whether the court has accurately articulated GSEC's argument in regard to Section 5's language, the court nonetheless finds that the cited provision in no way alters the outcome in this case. The contract undisputedly provides identical warranty waivers and remedy limitations for goods and services or software in the Terms and Conditions and the License Agreement, and such remedies are exclusive. *Compare* Def. App., at 293 (Terms and Conditions ¶ 5(e)) ("If Buyer discovers any warranty defects with respect to the Goods manufactured by Seller (other than the firmware, which shall be subject to warranty claims under the Software License Agreement) or Services and notifies Seller thereof in writing during the applicable warranty period . . . Seller shall (i) correct any defects . . . and (ii) at Seller's option, either repair or replace that portion of the defective Good(s). If . . . a defective Good manufactured by seller cannot be repaired or replaced . . . Seller will refund to Buyer the purchase price . . . ."), *and* Def. App., at 293 (Terms and Conditions ¶ 6(A)) (("The remedies of Buyer set forth in Section 5 of this Agreement are exclusive remedies for all claims based on defective Goods (other than software, including firmware, which is covered by the Software License Agreement) or Services."), *with* Def. App., at 297 (Software License Agreement) ("[I]f Emerson is notified in writing of such nonconformity during the applicable warranty period, Emerson shall be promptly remedied [sic] such non-conformity (at its expense), by correction . . . . If such remedies are impracticable, Emerson shall promptly refund to [GSEC] the purchase price . . . ."), *and* Def. App., at 297 ("The warranties set forth above are the exclusive remedies with respect to any warranty claim relating to the Software and shall be in lieu of all other warranties with respect thereto . . . ."). The court finds the summary judgment evidence establishes that defective software caused damage to the turbine, and such

damages are necessarily covered by the License Agreement; however, even assuming coverage by the Terms and Conditions (as a good or service), the applicable language and remedy are the same: repair or refund of purchase price. Both contract sections expressly state that such remedies are exclusive for all claims based on alleged defects, and GSEC is bound by the express terms of the agreement it negotiated.

In an attempt to avoid this construction, GSEC points to the language contained in Section 6 of the Terms and Conditions, which provides as follows:

> In no event, regardless of the form of the claim or cause of action (whether based in contract, infringement, negligence, strict liability, other tort or otherwise), shall either party's liability to the other party and/or its customers *with respect to any claim arising in connection with this Agreement* exceed the greater of (i) price to buyer of the specific goods manufactured or services provided by Seller giving rise to the claim or cause of action, or (ii) $2.5 Million.

Def. App., at 293 ¶ 6(B) (Terms and Conditions) (emphasis added). GSEC submits that this provision reflects the parties' intent that the language contained in both the License Agreement (software) and the Terms and Conditions (goods and services), disclaiming any additional warranties and limiting remedies to simply repair or refund, *is not* exclusive and that the parties contemplated other causes of action or methods of recovery. Pl.'s Resp., at 12. In essence, GSEC argues this interpretation is required so as to "harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *See J.M. Davidson, Inc.*, 128 S.W.3d at 229. Stated alternatively, GSEC contends that if the contract's exclusivity provisions truly limit it to only repair or refund for defects in the DCS, such a construction renders the cap language superfluous and therefore does not give meaning to all provisions of the contract. GSEC correctly states the legal principle, but the court disagrees with its application and conclusion.

As previously noted, the court must give effect to the parties' intent as expressed in the plain language of the contract taken as a whole. Here, the court has found that the summary

judgment proof establishes a defect in the DCS software, and that the terms of the License Agreement provide an exclusive remedy of repair or refund of the purchase money, which Emerson has fulfilled.[20]

The License Agreement's language stating that "the rights and obligations of the Parties hereunder shall be subject to the limitations set forth in Section 6 of the Terms and Conditions" (which obviously include the language of 6(B)) requires no different result. GSEC's argument presumes the only conceivable legal dispute that could arise in connection with the parties' contract is one involving defective DCS software; if true, such a scenario would admittedly render the damage cap language superfluous. This interpretation, however, assumes too much. If claims or disputes could arise "in connection with [the] Agreement" *separate and apart from alleged defects in the DCS software*, the damage or cap limit of Section 6(B) can still be given legal effect in harmony with the contract's exclusive remedy provisions related to the software. Emerson cites three examples in its Reply where Section 6(B)'s limits would otherwise come into play: (1) breach of contract in the event Emerson failed to deliver the control system; (2) damage caused by Emerson personnel while on GSEC's property during installation of the control system; and (3) Emerson's breach of the contract's confidentiality clause. Def.'s Reply, at 6. The court does not believe this list to be exhaustive, but it is sufficient to make the point—the contract's general damage cap or limit can still have legal effect and import while being construed in harmony with the parties' expressed intent to exclusively limit available remedies for defects in the DCS software.

---

[20] Even if the defect in the DCS is considered a good or service, and therefore covered under the contract's Terms and Conditions, the court finds the warranty exclusions and remedies to be the same—repair or refund of the purchase price.

This conclusion also aligns with the "fundamental axiom of contract interpretation that specific provisions control general provisions." *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002) (citing Restatement (Second) of Contracts § 203(c)); *see Claimant ID 100218776 v. BP Expl. & Prod., Inc.*, 712 F. App'x 372, 375 (5th Cir. 2017) (citations omitted) ("It is likewise well-settled that where a general provision and a narrow, specific provision overlap and the specific provision fits the facts at hand, the specific provision controls. This prevents the general provision from swallowing the specific, and it gives effect to every clause in a contract."); *C.A.U.S.E. v. Vill. Green Homeowners Ass'n, Inc.*, 531 S.W.3d 268, 275 (Tex. App.—San Antonio 2017, no pet.) (recognizing that under Texas law "more specific provisions in a contract prevail over general mandates"). Here, the parties addressed, with very specific and exclusive language, the issue of warranties and remedies available for breach of an express warranty, i.e., a defect in the software. Texas law does not allow the court to read the contract's general clause capping damages for all other claims or causes of action as altering or expanding the contract's specific provisions limiting remedies for express warranty claims. *See, e.g., Aerus LLC v. Pro Team, Inc.*, No. Civ.A. 304CV1985M, 2005 WL 1131093, at *5 (N.D. Tex. May 9, 2005) (applying foregoing principle, court found that forum selection clause in contract, which specifically addressed the cause of action asserted by plaintiff, controlled over another contractual forum clause that governed "an array of other conflicts"); *C.A.U.S.E.*, 531 S.W.3d at 275 (holding that in dispute over whether homeowners association could force home owners to use particular waste and recycling provider, specific provision in agreement requiring homeowners to collect or dispose of garbage at their expense controlled over general clause authorizing homeowners association to "operate, maintain, and manage the common areas of the subdivision" (including streets), thus entitling homeowners to judgment as a matter of law).

Finally, GSEC's argument in regard to the significance of the Cover Letter similarly fails to alter the court's conclusion. GSEC asserts that in the Cover Letter, which holds the highest precedence in the documents forming the contract, Emerson expressly warrants that through the DCS replacement project it will be "determining optimal operating controls and offering tremendous cost savings," and providing "industry-specific applications, unmatched experience, and a highly skilled team of engineers." Pl.'s Resp., at 13 (quoting Def. App., at 289 (Krecek Decl. Ex. C)). GSEC posits that this alleged warranty "contains no limitations and was breached by [Emerson's] conduct." *Id.* Emerson counters by asserting that to the extent the Cover Letter creates an express warranty, it is still subject to the exclusive remedies provided in the License Agreement. Def.'s Reply, at 8–9. The court does not find GSEC's argument persuasive. Even if the Cover Letter did create an express warranty independent of the warranties in the License Agreement, the License Agreement's "Limitations and Remedies" section nevertheless unambiguously states that the warranties or remedies set forth therein "are the exclusive remedies with respect *to any warranty claim relating to the Software* and shall be in lieu of all other warranties . . . whether statutory, express or implied . . . ." Def. App., at 297. Thus, regardless of where the warranty arises in the document, GSEC's only remedies for breach of warranty would be either to have the defect repaired or to have the purchase money refunded.

In summary, Emerson is entitled to summary judgment as to GSEC's breach of contract claim because GSEC accepted the DCS rather than revoking its acceptance or returning the DCS. The parties' contract also requires entry of summary judgment as to GSEC's breach of warranty claim because the undisputed evidence shows Emerson fulfilled its warranty and remedial obligations under the express terms of the contract: it corrected, at Emerson's expense and to

GSEC's satisfaction, the software defect in the DCS. As a result, the undersigned recommends that the district judge **GRANT** Emerson's motion as to GSEC's contract-based claims.

### D. Tort Claims and the Economic Loss Doctrine

#### 1. The parties' positions.

Emerson next argues that the economic loss rule bars GSEC's tort claims (i.e., negligence and strict liability) for the recovery of damage to the Unit 3 turbine. Def.'s Br., at 13–18.[21] The application of the economic loss rule is a question of law for the court to decide. *U.S. Steel Corp. v. John H. Young, Inc.*, No. 03-16-00206-cv, 2018 WL 911861, at *1 n.2 (Tex. App.—Austin Feb. 16, 2018, no pet.) (citing *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 365 (Tex. App.—Houston [1st Dist.] 2013, no pet.)) (recognizing that "application of the economic-loss rule is a question of law" to be determined by the court); *see Petroleum Helicopters, Inc. v. Avco Corp.*, 930 F.2d 389, 393 n.9 (5th Cir. 1991) (noting that the question of what constitutes "other property" in economic loss rule analysis is a legal question because such a determination rests upon the court's "contractual interpretation" of the agreement between the parties).

Emerson contends the economic loss rule bars GSEC's tort claims because once the DCS was installed into the Unit 3 turbine, the DCS became an integrated, component part of Unit 3 itself (i.e., the finished product). Thus, Emerson asserts that the damage to Unit 3 constitutes damage to the product, not damage to other property. Def.'s Br., at 13–18; Def.'s Reply, at 14–15. Moreover, Emerson argues that "it was entirely foreseeable that the steam turbine could be

---

[21] Unlike limitations of warranty, the economic loss rule is not an affirmative defense (*see Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867–68 (Tex. 2007)), but rather a "court-adopted rule for interpreting whether a party is barred from seeking damages in an action alleging tort injuries resulting from a contract between the parties." *Tarrant County Hosp. Dist. v. GE Automation Svcs. Inc.*, 156 S.W.3d 885, 895 (Tex. App.—Fort Worth 2005, no pet.).

damaged if the DCS supplied by Emerson did not perform as warranted" and GSEC "should not be permitted to evade the allocation of risk set forth in the contract." Def.'s Br., at 19; *see* Def.'s Reply, at 11–13.

In response, GSEC asserts that the economic loss rule does not bar its tort claims because the damage to Unit 3's turbine constitutes "other property." Pl.'s Resp., at 14–21. GSEC contends that it contracted with Emerson for the new DCS—not the entire steam turbine (i.e., Unit 3); therefore, the "product" in this case and the "object of contract . . . that governs the rights of the parties" is the DCS itself. *Id.* at 14. In other words, the preexisting parts of the steam turbine constitute "other property." *Id.* GSEC argues that the "relevant contract sets out the requirements and responsibilities of the parties *with regard to the purchase of the DCS only*" because they bargained for Unit 3 separately, i.e., with a different company approximately fourteen years prior to the Emerson contract. *Id.* at 18 (emphasis added). In addition, GSEC suggests that Emerson had a duty, independent of any obligation undertaken in the contract, not to damage the preexisting turbine. *Id.* at 16–17.

## 2. The economic loss doctrine or rule.

### a. Applicable law.

Before examining the economic loss rule and its application herein, the court must first determine what law governs. When sitting in diversity jurisdiction, a federal court applies the law of the state in which it sits. *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938)). To resolve an issue of state law, this court must "apply the law as interpreted by the state's highest court." *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 290 (5th Cir. 2016) (quoting *Barfield v. Madison Cty.*, 212 F.3d 269, 271–72 (5th Cir. 2000)). Where no final disposition is directly on point, federal courts "must make

31

an '*Erie*-guess', predicting how that court would rule." *Id.* at 291 (quoting *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 199 (5th Cir. 2006)); *see generally Erie*, 304 U.S. at 79–80 (explaining that there is no federal common law and federal courts must apply the law as interpreted by the state's highest court in resolving issues of state law). Making such an *Erie* guess "as to how the Texas Supreme Court would rule" requires that this court examine the following:

> (1) decisions of the [Texas] Supreme Court in analogous cases, (2) the rationales and analyses underlying [Texas] Supreme Court decisions on related issues, (3) dicta by the [Texas] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Texas] courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Shakeri*, 816 F.3d at 291 (alterations in original) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010)). Where, however, a panel of the Fifth Circuit has ruled on a specific question or issue and such holding has not been superseded by either Texas case law or a change in statutory authority, this court is bound by such interpretation of Texas law. *Lozovyy v. Kurtz*, 813 F.3d 576, 580 (5th Cir. 2015); *Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685, 687 (5th Cir. 2007).

### b. The Texas economic loss rule:  what is it?

In Texas, the economic loss rule (ELR) "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy."[22] *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718–19 (Tex. 2014) (citing *LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435

---

[22] In *Nobility Homes*, 557 S.W.2d at 78 n.1, the Supreme Court of Texas defined economic loss as follows:
> Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket" the difference in value between what is given and received or "loss of bargain" the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

S.W.3d 234, 243 (Tex. 2014)); *see Caldwell v. Wright*, 2016 WL 4249136, at *3 (Tex. App.—

Waco Aug. 10, 2016, no pet.) (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d

407, 418 (Tex. 2011)) (describing the ELR as "a court-adopted rule for determining whether a

party is barred from seeking damages in certain actions"). Stated more concretely, the ELR applies

when a plaintiff suffers losses caused by the failure of a product and the damage or loss is limited

to the product itself. *Equistar*, 240 S.W.3d at 867. Recovery is typically limited in such

circumstances to remedies grounded in contract rather than tort. *See, e.g., Signal Oil & Gas Co.

v. Universal Oil Prods.*, 572 S.W.2d 320, 325 (Tex. 1978) ("[W]here only the product itself is

damaged, such damage constitutes economic loss recoverable only as damages for breach of an

implied warranty under the [Business and Commerce Code]."); *Mid Continent Aircraft Corp. v.

Curry Cty. Spraying Serv. Inc.*, 572 S.W.2d 308, 313 (Tex. 1978) ("[I]njury to the defective

product itself is an economic loss governed by the Uniform Commercial Code."). As such, the

ELR precludes recovery for economic loss under product strict liability law absent physical injury

to a person or property other than the product itself. *See Equistar Chems., L.P. v. Dresser-Rand

Co.*, 123 S.W.3d 584, 587 (Tex. App.—Houston [14th Dist.] 2003), *rev'd on other grounds by* 240

S.W.3d 864 (Tex. 2007) ("In transactions between commercial buyers and sellers, if damage

occurs only to the product that passed between them, the claim is one for economic loss and must

be brought on the parties' contract; conversely, if there is physical injury to persons or 'other

property' (that is, property other than the product itself), those claims may be brought in tort.").

The ELR similarly forecloses most negligence claims where the injury is only the economic loss

to the subject of the contract itself. *See, e.g., Arkwright–Boston Mfrs. Mut. Ins. Co. v.

Westinghouse Elec. Corp.*, 844 F.2d 1174, 1177–78 (5th Cir. 1988) (analyzing negligence claim

against manufacturer of electrical turbine, court denied plaintiff recovery for damage to turbine

caused by a broken turbine blade because "Texas law does not permit recovery under a negligence theory for economic loss resulting from damages to a defective product").

Despite its recognition by the Texas Supreme Court over forty years ago, Texas courts, as well as others across the country, continue to wrestle with the ELR's scope and application. Courts frequently have difficulty defining and applying the ELR because "there is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law." *Sharyland*, 354 S.W.3d at 415 (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 534–35 (2009)). Thus, in determining whether the ELR applies to the facts in a specific case, "the Court must be careful not to import rules arising in dissimilar areas of tort law and dissimilar facts . . . ." *TEU Servs. Inc. v. Inventronics USA Inc.*, Civil No. SA-16-CV-01023-RCL, 2018 WL 3338217, at *3 (S.D. Tex. Feb. 5, 2018).

### 3. A closer examination of the parties' arguments.

Emerson alleges that the ELR bars GSEC's tort claims because once it installed the DCS into the Unit 3 turbine, the DCS became an integrated, component part of Unit 3 (i.e., the finished product). Thus, Emerson asserts that the damage to Unit 3 constitutes damage to the product itself, not damage to other property. Def.'s Br., at 13–18; Def.'s Reply, at 14–15. Emerson contends that the turbine should not be considered "other property" because the DCS was specifically configured for and integrated into the turbine and would have no use otherwise, thereby making it the "product itself." Def.'s Br., at 17–18. In arguing this, Emerson attempts to place the facts of this case within the holdings of several Texas state court decisions, and federal cases applying Texas law, where the courts have held that a plaintiff cannot recover for damage caused to a product as a whole by a component part supplied by or to the original manufacturer for integration

34

into the finished product. *See, e.g., Lopez v. Huron*, 490 S.W.3d 517, 524–25 (Tex. App.—San Antonio 2016, no pet.) (finding that final product (packaged masa) damaged by defective component part (plastic bags) did not constitute "other property" and thus the ELR barred manufacturer plaintiff's tort claims); *Equistar*, 123 S.W.3d at 589–90 (holding that replacement impellers later supplied by the original manufacturer of a compressor were component parts of the compressors, and damage to compressors caused by defective impellers could not be considered "other property").

Emerson also asserts that "it was entirely foreseeable that the steam turbine could be damaged if the DCS supplied by Emerson did not perform as warranted" and GSEC "should not be permitted to evade the allocation of risk set forth in the contract." Def.'s Br., at 19; *see also* Def.'s Reply, at 11–13. To support this argument, Emerson relies on *Alcan Aluminum Corp.*, where a judge in this district, applying Texas law, surveyed court decisions from other jurisdictions addressing whether the ELR bars tort claims when a component part damages a completed product. 133 F. Supp. 2d at 505. The court concluded that the Texas Supreme Court would reject a tort action against a component supplier for damage to the completed product because "the most common rationale for such conclusions is that damage to other components was clearly foreseeable" and that "parties can protect themselves from foreseeable consequences in the contract, which is more efficient than tort remedies." *Id.* Emerson urges the court to adopt the same foreseeability analysis here because "the parties are sophisticated entities" that were capable of protecting themselves in the contract and "it was entirely foreseeable at the time of contracting that the control system supplied by Emerson could damage [the turbine]." Def.'s Reply, at 11.

GSEC understandably disagrees, and argues that where the subject of the contract (the DCS) is a component part of what was ultimately damaged (the turbine), Texas law requires the

court to determine the object of the parties' contract or bargain—or, stated alternatively, whether the parties bargained separately for the individual component(s). Pl.'s Resp., at 17–20. GSEC contends that it contracted with Emerson for the new DCS—not the entire steam turbine (Unit 3); therefore, the "product" in this case and the "object of contract . . . that governs the rights of the parties" is the DCS itself. *Id.* at 14. GSEC asserts that the "relevant contract sets out the requirements and responsibilities of the parties *with regard to the purchase of the DCS only*" because they bargained for Unit 3 separately, i.e., with a different company approximately fourteen years prior to the Emerson contract. *Id.* at 18 (emphasis added). According to GSEC, although the DCS is a component part of Unit 3, under *American Eagle Insurance Co. v. United Technologies Corp.*, 48 F.3d 142 (5th Cir. 1995), the preexisting turbine, i.e., Unit 3, constitutes "other property." *Id.* at 17–20.

In *American Eagle*, the Fifth Circuit, ostensibly applying Texas law, looked to its prior *maritime law* decision in *Shipco v. Avondale Shipyards, Inc.*, 825 F.2d 925 (5th Cir. 1987), to conclude that the "controlling inquiry" courts must make when applying the ELR is "whether the parties bargained for individual components of the [product]." *Am. Eagle*, 48 F.3d at 144. Here, GSEC asserts that they bargained for the DCS separately from the turbine. Pl.'s Resp., at 18. Moreover, GSEC insists that they entered into and negotiated a contract solely for the DCS—not for the integrated steam turbine (i.e., Unit 3)—and the contract delineating the parties' bargain sets out the requirements and responsibilities of the parties with regard to the purchase of only the DCS. *Id.* In addition, GSEC cites the Texas Supreme Court's decision in *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716 (Tex. 2014) in support of its assertion that Emerson had a duty not to damage Unit 3, independent of any obligation undertaken in the DCS contract, and that it breached such duty. Pl.'s Resp., at 16–17.

To properly evaluate Emerson's motion seeking summary judgment as to GSEC's tort claims, this court must determine what constitutes the "product" and "other property" between the DCS and turbine. If the DCS, as an integrated component part, and the turbine are considered the product, the Texas ELR would preclude recovery for damage sustained by the turbine due to the defective DCS. If, however, under Texas law the turbine is considered "other property," then GSEC can recover in tort for damage to the turbine, assuming it can establish the necessary factual elements of its claims.

### 4. The Texas economic loss rule and "other property."

The distinction between "other property" and the "product itself" is usually straightforward (*Alcan*, 133 F. Supp. 2d at 503), and Texas courts have had little difficulty with this distinction where a product, purchased by the plaintiff from a manufacturer, is damaged by a defective component that was an integrated part of the product when sold. In such cases, Texas courts have consistently viewed the component part and product as a whole and applied the ELR, thereby precluding a finding of damage to "other property." *See, e.g., Lopez*, 490 S.W.3d at 522 (quoting *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 92 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)) ("Texas courts have rejected the argument that damage to a finished product caused by a defective component part constitutes damage to 'other property,' so as to permit tort recovery for damage to the finished product."); *Mid Continent*, 572 S.W.2d at 312–13 (rejecting under the ELR plaintiff's strict liability theory of recovery for damage to an airplane caused by a defective engine where the engine was a component part of the whole product (the airplane); therefore, the engine only damaged the product itself). Federal courts interpreting Texas law have reached the same conclusion. *See, e.g., Hininger v. Case Corp.*, 23 F.3d 124, 126–27 (5th Cir. 1994) (finding that a plaintiff could not recover economic losses from a component manufacturer for damage to

37

finished product caused by defective component); *Arkwright–Boston*, 844 F.2d at 1177–78 (denying plaintiff recovery for damage to turbine caused by a broken turbine blade because "Texas law does not permit recovery under a negligence theory for economic loss resulting from damages to a defective product"); *see also Sanitarios Lamosa*, 2005 WL 2405923, at *6 (citing *Mid Continent*, 572 S.W.2d at 311–13) (stating that the Texas Supreme Court has determined "when a component part sold as part of a whole product fails and damages the whole product, the damage is to the whole product and the suit cannot be brought in tort").

And while it appears the Texas Supreme Court has not specifically addressed the question of whether the ELR applies to products damaged by *replacement component parts* furnished by the *original manufacturer or supplier*, lower Texas courts have shown no hesitation in extending its application. *See, e.g., Equistar*, 123 S.W.3d at 589 (finding that compressor damage caused by replacement component parts (impellers) provided by the original seller did not constitute damage to other property); *Grizzly Mountain Aviation, Inc. v. Honeywell Int'l, Inc.*, No. 13-11-00676-CV, 2013 WL 5676069, at *7 (Tex. App.—Corpus Christi Oct. 17, 2013, no pet.) (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 873 (1986)) (concluding plaintiff's replacement of an original engine in a helicopter "with another [defective] engine purchased from the same manufacturer did not make the helicopter 'other property'" and plaintiff's product liability claim for damages to helicopter was barred by the ELR); *see also Petroleum Helicopter*, 930 F.2d at 393 (applying maritime law, court affirmed summary judgment based on ELR where plaintiff cannibalized replacement part (flotation device) from a helicopter originally acquired from the seller, and the replaced flotation device subsequently damaged a different helicopter also acquired from the same seller).

In addition, on a closely related question "[i]t does not appear that the Supreme Court of Texas itself 'has squarely addressed the issue of whether a component part manufacturer can be sued in tort for damage to a product by a commercial buyer who installs the component into its product.'" *TEU Servs.*, 2018 WL 3338217, at *5 (quoting *Sanitarios Lamosa*, 2005 WL 2405923, at *6). Nevertheless, courts construing Texas law have also applied the ELR to claims brought by plaintiffs who *are not end users* of the product, but instead purchase a component part and integrate it into the product for resale, and subsequently suffer loss due to the defective component damaging the completed product. These courts have consistently held that according to Texas law, the ELR forecloses any recovery for damage to the integrated product itself. *See, e.g.*, *Lopez*, 490 S.W.3d at 524–25; *see also TEU Servs.*, 2018 WL 3338217, at *4–5 (holding that plaintiff's integrated exterior light fixtures sold to consumers, which were damaged by defective LED drivers supplied by defendant and installed into fixtures by plaintiff, did not amount to "other property" under the Texas ELR because the "proper unit of analysis is the integrated product, not the individual components"); *Helen of Troy, L.P. v. Zotos Corp.*, 511 F. Supp. 2d 703, 722 (W.D. Tex. 2006) (finding economic loss resulting from the placement of defective bottles in hair straightening kits sold to consumers not recoverable in tort when damage was to the product itself (i.e., the kits)); *Sanitarios Lamosa*, 2005 WL 2405923, at *6 (applying Texas law, court found that toilets sold by plaintiff to end users were the completed product, and damage to the toilet tank or toilet itself caused by defendant's defective component part (ballcock, i.e., a float connected to a valve that opens or closes with a change in water level) did not constitute damage to "other property" under the ELR); *Alcan*, 133 F. Supp. 2d at 505 (finding that under Texas law, plaintiff's completed product, sold to consumers and damaged by defective component part supplied by defendant, is not "other property" for purposes of the ELR).

The issue presented here, however, is different than any of the foregoing scenarios. This case does not involve damage caused by a component or replacement part supplied by the original seller and installed inside a finished product, or a component part purchased by the plaintiff to integrate into a finished product for resale. Instead, the DCS in this case is a replacement component part purchased from a source other than the original manufacturer/supplier, long after the initial transaction,[23] to be used by GSEC not for resale after incorporation into a finished product, but rather at its facility after integration into the turbine (Unit 3). The parties do not cite, and the court has not found, any Texas or Fifth Circuit case law that directly addresses this issue. The court must therefore determine, based on Texas law, whether the steam turbine constitutes "other property."

### a. Determining what constitutes "other property" under Texas law: the "object of the bargain" test.

GSEC argues, and the court agrees, that Texas courts apply—at least in theory—an "object of the bargain" test to define what constitutes "other property" for the purpose of the ELR. *See, e.g., Chapman Custom Homes*, 445 S.W.3d at 718–19 (stating that the ELR "generally precludes recovery in tort . . . when the harm consists only of the economic loss of *a contractual expectancy*" (emphasis added)); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (citing several cases for support) ("When the injury is only the economic loss to the *subject of a contract itself*, the action sounds in contract alone." (emphasis added)); *Mid Continent*, 572 S.W.2d at 311, 313 (explaining that economic loss "is merely loss of value resulting from a failure of the product to perform according to the contractual bargain" and "[t]he loss is limited to what was involved in the transaction with the seller"); *see also Grizzly Mountain*, 2013 WL 5676069, at *7 (holding that

---

[23] The court notes that at least one Texas court recognized, in dicta, that "a different situation may be presented when a replacement part is purchased from someone other than the original seller." *Equistar*, 123 S.W.3d at 589 n.27.

plaintiff's claim for damages caused by a defective component part to a helicopter, purchased by plaintiff "as part of its bargain with [defendant]," was more properly brought under the UCC). Texas courts, however, have not strictly construed or applied the "benefit of the bargain" test in analyzing the ELR.

For example, the Texas Supreme Court's opinion in *Signal Oil & Gas Co. v. Universal Oil Products* is somewhat similar factually to the case at bar; however, it provides little practical guidance on where courts should draw the line between "the product" and "other property."[24]  In *Signal Oil*, Signal contracted with various parties (1) to procure the materials and equipment necessary to construct and (2) to actually build an isomax unit and hydrogen facility at the Signal plant located in Houston.  572 S.W.2d at 322–23.[25]  Signal alleged that defendants provided a defective isomax reactor charge heater ("a component part of the plant"), which caused an

---

[24] The Texas Supreme Court recently acknowledged that the absence of a "a bright-line rule, and the failure to analyze whether denying tort recovery for an economic loss in a particular situation is justified by the rationales for limiting recovery of such losses, has led to some confusion" over the ELR's proper application. *LAN/STV*, 435 S.W.3d at 241. The court observed that at least one commentator has described Texas ELR law as "murky," and that "[l]ess than a year after" unanimously adopting the ELR in *Nobility Homes*, "the Court could not agree on what had been the basis for that decision." *Id.* at 241 & n.33 (noting Justice Pope's dissent in *Mid Continent* and his belief that *Nobility*'s holding was based on a lack of proof and findings supporting a strict liability claim, not the ELR).

Justice Pope expressed further confusion in *Signal Oil* (decided the same day as *Mid Continent*) over how the court construed *Mid Continent* as a contract (rather than strict liability) case by finding no damage to "other property," yet recognized a strict liability claim in *Signal Oil* based on damage to property other than the product. The object of both contracts was the damaged product purchased from the defendant—"[t]he airplane in *Mid Continent* crashed because a crankshaft gear bolt had backed out of position"; in *Signal Oil*, the defective heater damaged "the very isomax unit and hydrogen plant that Signal obtained" under contract from the defendants. *Signal Oil*, 572 S.W.2d at 332. Justice Pope concluded by noting that the court's "holdings are inconsistent and portend problems that could be avoided by adhering to" strict liability law. *Id.* Nevertheless, the Texas Supreme Court did (and continues to) confirm the general principle that "[t]he economic loss rule applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself." *LAN/STV*, 435 S.W.3d at 241 n.33 (citing *Equistar*, 240 S.W.3d at 867).

[25] Specifically, Signal executed a license agreement with Universal Oil Products (UOP) for use of its isomax process in Signal's plant. Signal subsequently contracted with Procon, a UOP subsidiary, to obtain the necessary materials and equipment to construct both the isomax unit and the hydrogen plant. UOP had previously agreed to provide Procon with the necessary engineering design specifications for constructing the isomax unit. Procon contracted with Alcorn to purchase the reactor charge heater, which Procon subsequently erected and installed. Signal sued UOP, Procon, and Alcorn under theories of, *inter alia*, strict liability and negligence for property damage and economic loss resulting from the explosion and fire. *Id.* at 322–23. For reasons unexplained, the trial court's judgment denying relief on Signal's claims against UOP was not before the court. *Id.* at 322 n.2.

41

explosion and fire at the Houston refinery. *Id.* at 322. Signal asserted that the heater itself, the isomax unit, and other refinery equipment and property were damaged in the explosion and sought recovery for those damages, alleging strict liability and implied warranty theories. *Id.* at 322–23. Distinguishing *Mid Continent*, which held that the ELR foreclosed strict liability claims where the product damages only itself, the court found that Signal had "properly alleged a cause of action in strict liability based upon its allegations of property damages"—"[t]o the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss." *Id.* at 325. Despite recognizing the viability of Signal's strict liability claim, the court ultimately denied recovery for damage to "other property" due to Signal's failure to obtain the necessary fact findings. *Id.* at 326.

This court finds the *Signal Oil* language to be more confusing than helpful in: (1) understanding how the Texas Supreme Court distinguished between the object of the contract and "other property"; and (2) making an *Erie* guess as to how that court would decide the issue today. The court did not use or discuss the "object of the bargain" standard it articulated in *Mid Continent* or subsequently in *Jim Walter Homes* for distinguishing between the product and other property. Further, application of that measure would seem to require an outcome different than that reached by the court. Because it appears that the isomax unit and plant were the object of the various contracts, i.e., what Signal bargained for, the entire plant would qualify as the product rather than other property. In addition, other than simply holding that the ELR did not preclude a

strict liability claim for damage to other property,[26] the court provided no analysis or explanation for why it apparently considered everything beyond the heater to qualify as "other property."[27]

Lower Texas courts have neither explored the intricacies of *Signal's* holding nor applied it in as broad of terms as its wording would suggest. Instead, these courts have merely read *Signal* as permitting recovery "to other surrounding property"—not as allowing recovery for damage to a finished product caused by a component part. *See, e.g.*, *Grizzly Mountain*, 2013 WL 5676069, at *8 (quoting *Signal Oil*, 572 S.W.2d at 325) (explaining that a claim for damages "to other surrounding property" is not barred by the ELR but holding that defective "replacement parts provided by the original seller do not make the original product 'other property'"); *see also TEU Servs.*, 2018 WL 3338217, at *5 (quoting *Lopez*, 490 S.W.3d at 522) (explaining that although not addressed by the Supreme Court of Texas, "lower 'Texas courts have' uniformly 'rejected the argument that damage to a finished product caused by a defective component part constitutes damage to other property, so as to permit tort recovery for damage to the finished product'"). Thus, while relevant, *Signal Oil* and the "benefit of the bargain" test do not directly answer the question before this court—does Unit 3's turbine constitute part of the "product" or does it constitute "other property"? This court therefore looks to the rationales and analyses underlying Texas Supreme Court decisions on related issues, dicta by the Texas Supreme Court, lower state court decisions,

---

[26] The court supported this conclusion by noting Signal sought damages for "other equipment in the unit and other property in the area," as well as for "[a] large quantity of product contained in the unit [presumably oil or petroleum being refined]" that was damaged or lost. Although implied by its holding, the court did not specifically state that *all* of the identified items, e.g., catalyst and "other equipment . . . and other property in the area" met the qualifications for "other property," as opposed to just the product in the unit, which in this court's view would more logically be viewed as "other property." *Id.* at 325.

[27] Indeed, the court's broad language led subsequent parties to believe that they could recover for damage to the product itself *if* they also incurred damage to other property. *See, e.g.*, *Murray v. Ford Motor Co.*, 97 S.W.3d 888, 892 (Tex. App.—Dallas 2003, no pet.). The Texas Supreme Court later clarified, however, that "damage caused by a defective product to itself cannot be recovered in an action for strict products liability, even if there is also personal injury or injury to other property." *LAN/STV*, 435 S.W.3d at 241–42 & n.34; *see also Murray*, 97 S.W.3d at 892 (rejecting as an incorrect interpretation of the court's dicta plaintiffs' argument that *Signal Oil* held the ELR does not bar recovery for damage to the product itself where there is also loss to other property).

and federal as well as out of state court decisions to assist in resolving this issue. *See Shakeri*, 816 F.3d at 291.

### b. The rationales and policy considerations underpinning the Texas Supreme Court's adoption of the ELR support its broad application.

Since its adoption, the Texas Supreme Court has consistently emphasized several important rationales underlying the ELR. The Texas Supreme Court first recognized the ELR in *Nobility Homes*, where it held that a plaintiff cannot recover his economic loss under strict product liability law but can "recover such loss under the implied warranties of the Uniform Commercial Code." *See Sharyland*, 354 S.W.3d at 416 (quoting *Nobility Homes*, 557 S.W.2d at 78) (reviewing development of the ELR in Texas). The court reasoned that such damages "were more appropriately recovered through the UCC's thorough commercial-warranty framework" because it protects manufacturers from "unlimited and unforeseeable liability" for economic losses and provides consumers the means by which they may seek redress for economic losses caused by a product defect. *Id.* (citing *Nobility Homes*, 557 S.W.2d at 81–82).

Quoting at length from the *Restatement (Third) of Torts: Liability for Economic Harm,* the Texas Supreme Court recently reaffirmed these "principal rationales" for the ELR, acknowledging that while "[e]conomic injuries may be no less important than injuries of other kinds," courts nevertheless "impose tort liability for economic loss more selectively than liability for other types of harms." *LAN/STV*, 435 S.W.3d at 240 (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c (Am. Law Inst., Tentative Draft No. 1, 2012)). Reasons for this apportionment include the potential indeterminate and disproportionate liability inherent in economic losses and the fact that risks associated with economic loss "tend to be especially well suited to allocation by contract." *Id.* (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c). Further quoting the Restatement's "well-summarized" justification for applying

the ELR, the court noted that imposition of liability "out of proportion" to a defendant's culpability can "create an exaggerated pressure to avoid an activity altogether," and a buyer relying on a seller's words when entering a transaction "has a full chance to consider how to manage the risks involved, whether by inspecting the item or investment, obtaining insurance against the risk of disappointment, or making a contract that assigns the risk of loss to someone else." *Id.* (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c) (recognizing that "money is a complete remedy for an economic injury," whether in the form of insurance, indemnity, or some other form of replacement payment). The foregoing considerations also "make it hard for a court to know what allocation of responsibility for economic loss" would best serve the interests of the parties:

> A contract that settles responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done. The contract will better reflect the preferences of the parties and help prevent the need for speculation and litigation later. Contracts also are governed by a body of commercial law that has been developed to address economic loss, and thus will often be better suited for that task than the law of torts. In short, contracts to manage the risk of economic loss are more often possible, and more often desirable, than contracts to manage risks of other types of injury. As a result, courts generally do not recognize tort liability for economic losses caused by the breach of a contract between the parties, and often restrict the role of tort law in other circumstances in which protection by contract is available.

*Id.* at 241 (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c).

In sum, the Texas Supreme Court's reasoning and analysis demonstrate a strong preference for remedying economic loss through contract rather than tort law. The cited criteria and rationale, in this court's view, encourage a finding that Texas law requires an expansive, rather than restrictive, application of the ELR. An examination of other Texas cases confirms such an approach.

### c. Lower Texas court cases applying the ELR.

Several lower Texas court cases, although they do not address the specific factual situation at issue in this case, help guide this court's analysis in applying the benefit of the bargain test and determining whether Unit 3's turbine constitutes "other property." In *Equistar Chemicals, L.P. v. Dresser-Rand Co.*, for example, the Houston Court of Appeals considered application of the ELR with respect to replacement parts. 123 S.W.3d at 585–86. Plaintiff sued defendant for damages resulting from the failure of replacement impellers—"integral components in two large compressors" defendant had sold to plaintiff's predecessor. *Id.* at 585. In 1989, plaintiff's predecessor decided to increase production by installing larger impellers, purchased from defendant. *Id.* After the replacement impellers failed several times, plaintiff opted in 1996 to reduce the impellers to their original size, but in April 1999, one of the impellers again failed. *Id.* at 585–86. Defendant repaired the broken impeller; however, two weeks later that replacement failed as well, and plaintiff filed suit. *Id.* at 586.

At trial, plaintiff "obtained favorable verdicts on both tort and warranty theories," but on appeal defendant argued the ELR barred plaintiff's recovery in tort. *Id.* In response, plaintiff first argued that the impellers were the "product" and the compressors were "other property" for which it could recover damages. *Id.* at 587. The court of appeals rejected this argument, explaining that the impellers were component parts of the compressors and that damage to the compressors "caused by the failure of one component could not be brought in tort because of the economic loss rule." *Id.* at 588 (citing *Mid Continent*, 572 S.W.2d at 310–11, 313). Plaintiff also contended that the impellers—replacement components installed ten years after the original bargain—"must be considered a separate product from the compressors." *Id.* But the court refused to distinguish between original and replacement component parts because "courts generally have not made any

such distinction." *Id.* Relying on the Third Circuit's opinion in *Sea-Land Service, Inc. v. General Electric Co.*, 134 F.3d 149 (3d Cir. 1998), the court reasoned that "replacement parts provided by the original seller do not make the original product 'other property.'" *Id.* at 589 (citing several cases for support). In dicta, the court acknowledged that the result might be different "when a replacement part is purchased from someone other than the original seller." *Id.* at 589 n.27 (citing *Transco Syndicate #1, Ltd. v. Bollinger Shipyards, Inc.*, 1 F. Supp. 2d 608, 612 (E.D. La. 1998)). The court ultimately concluded, however, that the ELR barred plaintiff's claim because "commercial parties may negotiate for whatever warranty or liability limits they choose, and adjust their price accordingly." *Id.* at 590 (citing *East River*, 476 U.S. at 873). Thus, although plaintiff and defendant bargained for replacement impellers, the court viewed the benefit of their bargain as a fully working compressor unit. *See id.*

Similarly, in *Grizzly Mountain v. Honeywell Int'l, Inc.*, the Corpus Christi Court of Appeals considered whether the ELR barred plaintiff's recovery for damages to a helicopter that contained a replacement engine manufactured by defendant. 2013 WL 5676069, at *1. Plaintiff initially purchased two helicopters, with registration numbers N263KA and N133KA, from a third party manufacturer in two separate transactions; the helicopter with registration number N133KA contained an engine manufactured by defendant. *Id.* at *1, *5. Sometime thereafter, plaintiff transferred the defendant-manufactured engine into the helicopter with registration number N263KA. *Id.* at *1. Plaintiff alleged that the N263KA helicopter subsequently crashed due to a "catastrophic failure of the engine reduction gearbox," which plaintiff claimed was due to defendant's defective engine design and manufacture. *Id.*

Applying Texas law, the court held that the ELR barred plaintiff's claims because the damaged helicopter did not constitute "other property." *Id.* at *6–7. The court first noted that

plaintiff did not have a contractual relationship with defendant such that the helicopter could amount to "other property" for which plaintiff separately bargained. *Id.* at *6 (citing *Pugh*, 243 S.W.3d at 93–94). The court further explained that "[w]hen analyzing application of the economic loss rule, the proper inquiry is to determine whether a loss is more appropriately compensated through tort law or under the [UCC]." *Id.* at *7 (citing *Mid Continent*, 572 S.W.2d at 310). Because plaintiff purchased the two helicopters, including the allegedly defective engine, "as part of its bargain with" the third party, the court concluded that plaintiff's claim was more properly brought as a warranty claim. *Id.* Stated differently, plaintiff purchased all of the items—helicopter hulls and the allegedly defective engine—in one transaction; plaintiff bargained, therefore, for the entire group of items. *See id.* In reaching this conclusion, the court discussed both *Equistar* and the United States Supreme Court's holding in *East River*. *Id.* at *6–7. Finding "no distinction between a replacement and original component part" based on these cases, the court held that the engine constituted a replacement component part and plaintiff could not recover for the damages to the "finished product"—the helicopter. *Id.* at *7–8.

The San Antonio Court of Appeals likewise concluded in *Lopez v. Huron* that plastic bags supplied by defendant to plaintiff for packaging its masa constituted component parts. 490 S.W.3d at 524. Plaintiff argued that the masa was "other property" for which it could recover in tort. *Id.* at 522. The court, after examining other cases dealing with "what is and is not considered 'other property'" under the ELR, ultimately held that the plastic bags were a component in a final product—the packaged masa. *Id.* at 524–25. The court reasoned that "[i]n the context of this commercial transaction, damage to the packaged masa could be reasonably contemplated by [plaintiff] and [defendant] in the event the bags were defective." *Id.* at 524. Thus, the court concluded that plaintiff could not recover the damages it suffered from the spoiled masa. *Id.* at

524–25.  In other words, despite the fact that the parties had only contracted for the plastic bags themselves, the court found the packaged masa to be the finished product—the true benefit of the bargain.  *See id.*

The foregoing cases demonstrate that while Texas courts generally articulate a "benefit of the bargain"-type test in ELR cases, in application they do not consider only the literal object of the contract—i.e., the part or product for which the parties contractually negotiated.  *See id.*; *Equistar*, 123 S.W.3d at 587–89.  Instead, Texas courts broadly define the "subject matter of the contract," looking not only to the negotiated-for component, but also to the ultimate use and purpose of the component and whether the parties could have reasonably contemplated—and therefore contractually addressed—the eventual damage.  *See Lopez*, 490 S.W.3d at 522–25; *see also Equistar*, 123 S.W.3d at 589–90 (quoting *Sea-Land*, 134 F.3d at 154) ("Since all commercial parties are *aware that replacement parts will be necessary*, the integrated product should encompass those replacement parts when they are installed in the engine." (emphasis added)).

### d.  Federal court cases applying the Texas ELR.

Federal courts applying Texas law have likewise broadly defined the "object of the bargain" test.  In *Alcan Aluminum Corp. v. BASF Corp.*, District Judge Sam Lindsay considered whether the ELR barred plaintiff's recovery for a defective component part's damage to other parts of an assembled product.  133 F. Supp. 2d at 503.  Specifically, plaintiff purchased foam from defendant, which plaintiff sprayed into aluminum panels (manufactured by plaintiff) for structural support and then sold to customers.  *Id.* at 488.  Plaintiff alleged that a defect in the spray foam system caused the aluminum panels to bubble and warp or deform.  *Id.*  Defendant challenged plaintiff's tort claims, contending, among other things, that its claims were barred by the ELR.  *Id.* at 503.  Highlighting a potentially "relevant distinction" between a plaintiff who purchases an

integrated product as a whole versus purchasing a component that the plaintiff then installs into an integrated product for either resale or personal use, the court noted that "[t]he boundary between the subject matter of a contract and 'other property' when the former is a component of the latter . . . is not completely clear." *Id.* at 503–04. The court specified that although Texas courts had not considered the issue, other jurisdictions have concluded that where a component damages an assembled product, the entire product is not "other property." *Id.* at 504 (citing several cases for support, including *Sea-Land*, 143 F.3d at 154–55). "The most common rationale for such conclusions," the court explained, "is that damage to the other components was clearly foreseeable, or even inevitable, in the context of the commercial transaction." *Id.* at 504. The court also noted that some courts focus instead on "the nature of the defect and the manner in which the damage occurred," but they ultimately reach the same result. *Id.* at 505 (quoting *Minneapolis Soc'y of Fine Arts v. Parker-Klein Assocs. Architects, Inc.*, 354 N.W.2d 816, 821 (Minn. 1984)). Finding those "rationales persuasive," the court opined that "if faced with the issue, Texas courts would . . . characterize damage to a product caused by a defective component as 'economic loss' rather than damage to 'other property,' and therefore not subject to recovery under a negligence theory." *Id.* Finding that damage to the panels was foreseeable, and as sophisticated entities, the parties could have protected themselves through contractual provisions, the court applied the ELR to plaintiff's claims and concluded that the damaged panels did not constitute "other property" for which plaintiff could recover. *Id.*

Several other federal courts have similarly held that where a defective component part integrated as part of a whole product damages the product, the ELR prohibits tort recovery. In *Sanitarios Lamosa, S.A. de C.V. v. DBHL, Inc.*, the District Court for the Southern District of Texas court found that plaintiff could not recover for damage to toilets caused by allegedly defective

ballcocks—a component part plaintiff installed into toilets and then sold to consumers—because the toilets constituted a completed product, not "other property" under Texas law. 2005 WL 2405923, at *6. Plaintiff argued that it purchased the ballcocks separately from defendant and placed them into its own toilet tanks, thus making the tanks other property. *Id.* The court disagreed, however, explaining that although Texas courts have not squarely addressed the issue, the Fifth Circuit and the *Alcan* court concluded that a component manufacturer cannot be sued in tort for damage to a commercial buyer's assembled product. *Id.*

A year later, the Western District in *Helen of Troy, L.P. v. Zotos Corp.* likewise held that a component-part manufacturer was not liable for damage caused by the component to a commercial buyer's assembled product. 511 F. Supp. 2d at 722–23. In *Helen of Troy*, plaintiff assembled and sold hair straightening kits. *Id.* at 707. Pursuant to the parties' contract, defendant agreed to supply plastic bottles filled with a liquid straightener solution—one item in kits assembled by plaintiff that also contained shampoo, conditioner, spray conditioner, and a powder. *Id.* The bottles provided by defendant leaked, damaging other items in the kits. *Id.* The court, relying on the holdings of *Sanitarios Lamosa* and *Alcan*, determined that the straightening kits "were the completed product into which Plaintiff packaged the [bottles defendant provided]." *Id.* at 722. The court explained that defendant knew the bottles would be used as components in kits plaintiff would assemble, and plaintiff did not allege anything other than economic loss, i.e., damage to the completed kit; thus, the ELR barred plaintiff's claim for damages. *Id.* at 722–23. In deciding the ELR applied, the court not only looked at the item for which the parties contracted, but also considered the foreseeability of the damages, the type of injury plaintiff suffered, and the fact that both parties were sophisticated commercial entities. *See id.* at 721–23.

Most recently, *TEU Services, Inc. v. Inventronics USA, Inc.* (another Western District case) also rejected a plaintiff's contention that its assembled product constituted "other property." 2018 WL 3338217, at *4–5. Specifically, plaintiff alleged that it purchased defective "drivers" from defendant, which plaintiff installed as a component part into its LED commercial lighting systems. *Id.* at *1. The drivers failed, causing damage to plaintiff's lighting systems. *Id.* Plaintiff argued that the drivers damaged other components of the lighting systems and that the damaged components therefore constituted "other property." The court disagreed, however, explaining that "Texas law is clear—other components in an integrated, finished product do not count as 'other property' for purposes of the economic-loss rule. The proper unit of analysis is the integrated product, not the individual components." *Id.* at *5. Based on this reasoning, the court denied plaintiff's damages claim. *Id.* at *5–6.

The foregoing cases demonstrate that courts broadly apply the Texas "benefit of the bargain" test. As a result, courts addressing the issue have generally concluded that a commercial buyer cannot recover economic losses from a component-part manufacturer for damage caused to a product by the integrated component part.

### e. Other relevant cases on the ELR.

Texas courts and federal courts within this circuit have relied on cases from other jurisdictions in analyzing the ELR. This court also finds such decisions instructive on the issue at hand. The *Equistar* court, for example, relied on the Third Circuit's opinion in *Sea-Land*, where the court found that an engine, damaged by a defective replacement part (connecting rod) installed ten years after the original sale, did not constitute "other property" under the ELR. 134 F.3d at 154. In *Sea-Land*, the plaintiff argued that it conducted two separate transactions: (1) the purchase of a defendant-manufactured engine in 1988, for which the benefit of the bargain was a properly

functioning engine; and (2) "[i]n 1990, it bargained for a properly functioning connecting rod"—a component of the engine. *Id.* The court rejected this argument, reasoning that "[t]he timing of the purchase of the component part may be relevant, but it is not dispositive." *Id.* at 155. Of particular importance to the case before this court is *Sealand*'s language observing that in purchasing and installing replacement parts, "the parties can, as with the original purchase, negotiate the terms of the sale and of any warranties." *Id.* at 154. Finding the object of the parties' bargain to be an integrated unit, i.e., the engine containing the replacement connecting rod, the court found no reason to deviate from applying the ELR, even where the items were purchased separately and under separate contracts. Id. at 154–55. As a result, the court affirmed the district court's holding that there was no recoverable damage to "other property." *Id.* at 155.

Although it applied maritime law, the court also finds the *Statia Terminals N.V. v. Huber, Inc.* case instructive because it analyzes and relies on the "object of the bargain" test. *See* No. Civ.A. 95–1633, 1998 WL 560358 (E.D. La. Aug. 31, 1998). There, the plaintiff argued that components of a ship's hydraulic system—supplied by defendant—injured other parts of the ship and its hydraulic system and, as damage to "other property," plaintiff could recover for the loss. *Id.* at *39. As explained by the court, however, the central question was whether the hydraulic system constituted "a single, integrated product or whether instead, it is merely a conglomerate of various individual components, each of which is a distinct product." *Id.* Noting that the Fifth Circuit has relied on the "object of the bargain" test in determining what constitutes "the product" and "other property," the court explained that the test is "a more sophisticated determination and not merely a mechanistic determination of whether the injuring components and the damaged property were sold under the umbrella of the same contract." *Id.* at *41. In the case of a plaintiff's purchase of component parts to install into a completed product, for example, the object of the

bargain is a fully-functioning product, "even though the object is realized *via* a series of coordinated transactions with several sellers." *Id.* Based on this conclusion, the court held that the object of the bargain was the conversion of plaintiff's ship into a multi-purpose emergency response vessel "powered by a central hydraulic system which was integral to every mission essential function of the vessel." *Id.* The court explained that "[t]o hold that component parts of the [ship] or component parts of the [ship's] central hydraulic system are 'other property' would clearly contravene well-settled law." *Id.* Accordingly, the court held plaintiff could not recover under tort theories but was "limited to those remedies available to it in contract, that is warranty." *Id.*

Finally, the court also finds the *Cincinnati Insurance Co. v. AM International, Inc.* case instructive in determining whether GSEC's claim for damages to the steam turbine is barred by the ELR. The plaintiff in *Cincinnati Insurance* brought suit against defendant on behalf of its insured—a commercial printing company—alleging that defendant supplied a replacement "transfer cylinder gear" for a printing press that later broke and caused damage to the press. 224 Wis. 2d 456, 459–60 (Wis. Ct. App. 1999). The printing company "suffered over $131,000 in property damage, repair costs and loss of business income," for which it was compensated through its insurance policy with plaintiff. *Id.* at 460. Plaintiff brought a subrogation action against the defendant manufacturer for negligence and strict liability, and defendant filed a motion for summary judgment based on the ELR, which the district court denied. *Id.* On appeal, the appellate court considered "whether the economic loss doctrine applies where a commercial purchaser buys used equipment containing a defective replacement part that causes damage to the equipment and results in repair costs and loss of business income." *Id.*

Plaintiff argued that the damage to the press constituted "damage to other property" for which it could recover. *Id.* at 461. Defendant asserted that where a component part damages a completed product, the damage is not to "other property" for purposes of the ELR. *Id.* at 462. The appellate court agreed with defendant, finding the gear to be a component part of the printing press, and thus under the ELR the plaintiff could not recover for damages to the press. *Id.* at 463. The court noted that "[t]he replacement gear was specifically designed by [defendant] to replace gears in the press" and constituted single parts of an integrated system. *Id.*; *see also Midwhey Powder Co., Inc. v. Clayton Industries*, 157 Wis. 2d 585, 590–91 (Wis. Ct. App. 1990) (applying ELR to plaintiff's claim for damages to steam turbine caused by generator, where court concluded each part (including generator) was a "component of a single system integrally connected to one another" such that turbine was not "other property"; as a result, ELR did not permit tort recovery against generator manufacturer). The replacement gear, the court explained, "ha[d] no function apart from the machine for which it was manufactured." *Cincinnati Insurance*, 224 Wis. 2d at 463. Although plaintiff argued, as has GSEC in this case, that the replacement gear was not part of an integrated system because "it was manufactured at a different time and by a different company" than the press manufacturer, the court rejected such a conclusion, holding that the identity of the manufacturer[28] did not have "any bearing" on application of the ELR. *Id.* at 463–64.

---

[28] The defendant manufacturer of the gear had purchased Harris Graphics, a company that had previously acquired Harris-Intertype Corporation (who originally manufactured the press and gears), for the right to operate the printing press replacement parts business. *Id.* at 459. Plaintiff argued the defendant merely acquired the right to manufacture and sell replacement parts, and was not the "legal successor" to Harris-Intertype, thus making defendant a different entity from that which manufactured the press. *Id.* at 463–64.

In deciding the ELR barred the plaintiff's tort claims, the court relied upon many of the same "policies underpinning the economic loss doctrine" identified by the Texas Supreme Court for its adoption of the ELR, including:

> (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Id.* at 465 (quoting *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 846 (Wis. 1998)). Observing that the ELR "serves to protect commercial parties' freedom to contract" and that the plaintiff was "attempting to recover in tort what [were] essentially contract damages" (*id.* at 465 (quoting *Daanen*, 573 N.W.2d at 847)), the court found that plaintiff could have negotiated for a warranty or some other contractual remedy had it wanted a performance guarantee. *Id.* at 466. Ultimately, the *Cincinnati Insurance* court applied the ELR to plaintiff's claims, "declin[ing] to place 'unbargained-for and unexpected risks' on the manufacturer where the insurer contracted to cover such risks." *Id.* at 466 (quoting *Daanen*, 573 N.W.2d at 849).

### f. The "separately bargained for" language in *American Eagle*, *Grizzly*, and *Pugh* does not preclude application of the ELR under the circumstances of this case.

As argued by GSEC, and as touched upon above, at least one Fifth Circuit decision (*American Eagle*) and two Texas state court cases (*Grizzly* and *Pugh*) seemingly suggest a different standard for determining applicability of the ELR: did the parties bargain separately for the component part at issue, as opposed to the integrated or completed product as a whole? Taken at face value, the language in these decisions suggests that if the parties did bargain separately, i.e., contracted specifically for the product or component that failed, the ELR would not apply and a tort claim could follow. *See, e.g.*, *Pugh*, 243 S.W.3d at 94–95 (citing *American Eagle*, 48 F.3d at 145) (finding that under controlling Texas case law, plaintiffs suffered no damage to "other

property" where they did not separately negotiate with defendant for the defective product, and ELR thereby prescribed their tort claim).

The court readily admits that if application of the ELR is as simple as determining whether the parties bargained separately for the DCS, the turbine would constitute "other property" and the court should deny Emerson's motion as to GSEC's tort claims. In this court's view, however, the current state of Texas and Fifth Circuit law does not permit such a simplistic or literal reading of the courts' language or the seemingly easy resolution such an interpretation would provide.[29] First, none of these courts actually found that the ELR *did not* apply based on the "bargained for separately" standard, and instead held that under the record as developed, the ELR in fact barred the plaintiffs' tort claims. *See, e.g., American Eagle*, 48 F.3d at 145 (finding, *inter alia*, no summary judgment evidence before the court indicating plaintiffs bargained separately for the engine); *Grizzly*, 2013 WL 5676069, at *6 (stating there is "no summary judgment evidence showing [plaintiff] formed a contractual relationship with [defendant] regarding the allegedly defective engine").[30]

---

[29] These cases also fail to explain *why* the "separately bargained for" condition would be dispositive on the ELR issue, or how such a prerequisite furthers the policy considerations identified by the Texas Supreme Court for applying the doctrine.

[30] In their briefing and in response to questioning at the hearing, neither party has identified any Texas or Fifth Circuit decision, construing Texas law, where a court refused to apply the ELR based on the fact the parties bargained separately for the defective item in question. Some courts outside Texas, however, have done so. *See, e.g., Agape Flights, Inc. v. Covington Aircraft Engines, Inc.*, No. CIV-09-492-FHS, 2012 WL 2792452, at *4 (E.D. Okla. July 9, 2012) (denying engine supplier's motion for summary judgment as to tort claims for damages caused to airplane by defective engine, where object of the parties' bargain was lease of the engine, and ELR therefore did not apply as the airplane is considered "other property"); *Transco Syndicate*, 1 F. Supp. 2d at 612–13 (refusing to apply ELR to plaintiff's tort claim for damages caused to tug boat by defective engines where plaintiff bargained separately for the engines—the tug "did not become the object of [the] contract . . . simply because [the] engines were installed on the vessel . . . [t]he object of parties' contract was two 'Good Runner' engines"); *see also Helicopter Consultants of Maui, Inc. v. Thales Avionics Inc.*, 2010 WL 11565653, at *8 (N.D. Tex. 2010) (finding that helicopter's replacement engine, damaged in an accident, constituted "other property" for purposes of the ELR where (1) plaintiff added engine after helicopter was placed in stream of commerce, (2) parties bargained separately for the engine and helicopter, and (3) it was unclear whether at the time of the initial transaction the parties could have foreseen the damages at issue).

Second, and of much more significance, the cited language cannot simply mean "did the parties bargain separately for the item?" The case law is rife with state and federal court decisions interpreting Texas law where the parties clearly bargained separately and only for the item in question, i.e., the object of the contract, and the court nevertheless applied the ELR in barring the plaintiff's tort claims. *See, e.g.*, *U.S. Steel Corp.*, 2018 WL 911861, at *4 (holding that where "subject matter of . . . dispute is the defective . . . [oil well] casing provided by [defendant] under its contract with [plaintiff], and the damages [plaintiff] incurred flowed from that contract . . . [plaintiff] suffered no damage beyond economic losses" and ELR therefore barred tort recovery); *Lopez*, 490 S.W.3d at 524–25 (finding that where defendant supplied defective component part (plastic bags) under contract with plaintiff manufacturer and bags damaged final product, ELR barred plaintiff's tort claims); *TEU Servs.*, 2018 WL 3338217, at *4–5, *6–7 (holding that ELR barred plaintiff's tort claims for damages to exterior light fixtures caused by defective component LED drivers supplied through contract with defendant); *Helen of Troy*, 511 F. Supp. 2d at 722 (applying ELR to bar plaintiff's negligence and strict liability claims where defective bottles contracted for from defendant damaged kits into which plaintiff manufacturer incorporated them, rendering kits unmarketable); *Sanitarios Lamosa*, 2005 WL 2405923, at *6 (holding the ELR precluded plaintiffs' tort claims for damages caused to its completed product (toilets) by defective component part (ballcocks) supplied under contract with defendant); *Alcan*, 133 F. Supp. 2d at 504 (concluding damage to aluminum panels caused by defective spray foam, supplied under contract between plaintiff and defendant and used as a structural component in the panels, did not constitute damage to "other property" and thus the ELR barred any tort claims).

To the contrary, this court finds that decisions such as *Grizzly*, *Pugh*, and *American Eagle* do not identify a separate, stand-alone measure for applying the ELR, but instead restate in an

alternative fashion the beginning point for all analysis under Texas law for the ELR—what is the object of the contract?  As demonstrated by the court's earlier examination of relevant case law, while determining the subject of the parties' contract is a crucial question in answering whether the ELR bars a tort claim, these courts' decisions frequently turn on additional factors such as (1) integration of component parts, (2) foreseeability of the harm, and (3) UCC policy considerations undergirding the ELR.  A close reading of *Grizzly* and *Pugh* shows that those courts recognize the foregoing criteria, thereby counseling strongly against a strict or limited reading of the "bargained for separately" language.  For example, in *Pugh* the court acknowledged the general premise that Texas courts apply the ELR where defective component parts damage a product in the hands of (1) the final consumer or (2) a manufacturer assembling the components into a final product for resale.  *Pugh*, 243 S.W.3d at 92.  More importantly, while noting the lack of contractual privity between the plaintiffs (home owners) and defendant (subcontractor), the court observed that plaintiffs' economic losses, i.e., damage caused to their home by defective siding, had been recovered through a judgment against the general contractor who built the home (and with whom plaintiffs *did* have a contract), thereby fulfilling the ELR's underlying policy consideration of not disrupting risk allocations made by commercial parties in their contract.  *Id.* at 94 & n.2 (citations omitted).  Similarly, the court in *Grizzly* found *Equistar* "instructive on the issue" of component parts and that incorporation of such parts into a larger product did not render the completed product "other property."  *Grizzly*, 2013 WL 5676069, at *7.  In concluding the ELR barred the plaintiff's tort claims for damages caused to its helicopter by a defective engine, the court stated that "[w]hen analyzing application of the economic loss rule, the proper inquiry is to determine whether a loss is more appropriately compensated through tort law or under the [UCC]."  *Id.*

These same considerations formed the basis for other courts to apply the ELR even where the injured party bargained separately for the defective item that caused the injury. As already exhaustively detailed herein, multiple decisions applying Texas law have refused to find that an integrated product or unit, damaged by a defective component part, would qualify as "other property" for purposes of the ELR. The courts have applied this standard where: (1) the defective component part was already integrated into the completed product at purchase; (2) the original manufacturer or supplier provided the defective component as a replacement part after the original sale; or (3) a manufacturer contracted for and incorporated the defective component part into an integrated product or unit and subsequently sold it to customers. *See, e.g., Mid Continent*, 572 S.W.2d at 312–13 (rejecting under the ELR plaintiff's strict liability claim for damage caused by airplane's defective engine, where engine was a component part of the whole product when purchased); *Equistar*, 123 S.W.3d at 589 (finding that compressor damage caused by replacement component parts (impellers) provided by the original seller did not constitute damage to other property); *TEU Servs.*, 2018 WL 3338217, at *4–5 (holding that plaintiff's integrated exterior light fixtures sold to consumers, which were damaged by defective LED drivers supplied by defendant and installed into fixtures by plaintiff, did not amount to "other property" under the Texas ELR because the "proper unit of analysis is the integrated product, not the individual components"); *Sanitarios Lamosa*, 2005 WL 2405923, at *6 (applying Texas law, court found that toilets sold by plaintiff were the completed product, and damage to the toilet tank or toilet itself caused by defendant's defective component part did not constitute damage to "other property" under the ELR); *Alcan*, 133 F. Supp. 2d at 505 (finding that under Texas law, plaintiff's completed product, sold to consumers and damaged by defective component part supplied by defendant, is not "other property" for purposes of the ELR); *Lopez*, 490 S.W.3d at 522 (holding that ELR barred plaintiff

manufacturer's tort claims where defective component part damaged final integrated product sold to consumers).

Similarly, these courts have also applied the ELR, even where the parties bargained separately for the defective item, where the harm ultimately sustained by the finished, integrated product was foreseeable by the parties. *See Alcan*, 133 F. Supp. 2d at 504 (finding that damage to panels was foreseeable and, as sophisticated entities, parties could have protected themselves through contractual provisions); *Lopez*, 490 S.W.3d at 522–25 (concluding plastic bags constituted a component part because plaintiff "used the plastic bags as a component in a final product" and the parties could reasonably foresee damage to the masa).

Finally, and in this court's view most significantly, these decisions reaffirm the underlying rationale proffered by the Texas Supreme Court in adopting the ELR: losses arising from defective products that cause no personal injury or damage to other property "tend to be especially well suited to allocation by contract" and decisions made by the contracting parties as to how best to manage the risk. *LAN/STV*, 435 S.W.3d at 240. Under these circumstances, "[a] contract that settles responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done." *Id.* at 241; *see Equistar*, 123 S.W.3d at 589–90 (finding that ELR "is based on the proposition that commercial parties may negotiate for whatever warranty or liability limits they choose, and adjust their price accordingly"); *Mid Continent*, 573 S.W.2d at 313 ("In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the [UCC]."); *TEU Servs.*, 2018 WL 3338217, at *4 (same, citing *Mid Continent*).

In sum, and for reasons explained in more detail below, this court finds that cases such as *American Eagle*, *Grizzly*, and *Pugh* do not support the conclusion that simply because the parties

bargained for the DCS separately, the DCS is "other property" and GSEC can pursue tort claims for their claimed damages. The standard set forth in these cases merely restates the "object of the bargain" test in an alternative fashion, and thus confirms the need to analyze other factors or considerations to determine whether the ELR precludes GSEC's tort claims.

### 5. Application: Damage to the turbine does not constitute damage to "other property."

Against the foregoing backdrop, the court makes its best *Erie* guess as to how the Texas Supreme Court would answer the question at hand. For the reasons discussed below, the court concludes that the Texas Supreme Court would hold that the object of the parties' bargain was a fully integrated and operating Unit 3 turbine, with the control unit (the DCS) constituting just one component of the whole functioning product. Thus, any damage to the turbine does not constitute damage to "other property" for which GSEC can recover in tort (negligence or strict liability).

#### a. The parties bargained for a fully-functioning Unit 3 turbine.

From the court's review of the contract, including the "offer sheet" or proposal from Emerson, which GSEC accepted, the DCS consists of a complex configuration of hardware (e.g., computers, servers, and LCD monitors) and various software programs integrated together that act as a "control interface for all engagement and control functions" of Unit 3. Def. App., at 2 ¶ 5 (Decl. of Glen Wagner). As a result, the DCS allows GSEC to control system devices, interface with field instrumentation, initiate startup and shutdown sequencing, adjust system settings and inputs/outputs that the turbine converts into energy, and operate and control Unit 3's integrated subsystems. *Id.*; *see* Def. App., at 307. This complex system is integral to the function of Unit 3; without the DCS, the steam turbine cannot operate. At the time of the contract, the parties knew that the DCS was a component of Unit 3. Specifically, Emerson's offer acknowledged the precise services and equipment it was to provide (and what it would not provide) with respect to the

"Steam Turbine Control" of Unit 3. *See* Def. App., at 304–19. Emerson replaced GSEC's outdated control system, integrating the updated hardware and software into the existing Unit 3. *See, e.g., id.* at 289 (referring to the Mustang Station project as a "Controls *Replacement* Project" (emphasis added)); 314 (describing Emerson's scope of supply as including "Systems: Replacement of *existing* Steam Turbine Control System" (emphasis added)); 316 (explaining the installation services "included in the Offer to *upgrade* Mustang Station *existing* Steam Turbine Control System"); 317 (providing for installation of "new Ovation plates with Ovation Controller and I/O modules in *existing* cabinets . . ." (emphasis added)). GSEC's goal, through the purchase of the updated Emerson DCS, was a more efficient and sophisticated means of controlling and monitoring the steam turbine (the product). *See id.* at 318. The contract and accompanying documents make clear that the DCS and steam turbine are component parts of a single system. Their relationship is integral; without one, the other serves little or no purpose. *See, e.g., TEU Servs.*, 2018 WL 3338217, at *5 (explaining that courts must focus on the "integrated product, not the individual components"); *Alcan*, 133 F. Supp. 2d at 505 (acknowledging that the defendant-supplied spray foam constituted a "structural component" of the plaintiff-manufactured aluminum panels); *see also Cincinnati Insurance*, 224 Wis. 2d at 463 (noting the integral relationship between the replacement gear and the printing press and clarifying that the gear "has no function apart from the machine for which it was manufactured"); *Midwhey Powder*, 157 Wis. 2d at 590–91 (applying the "integral system" test).

GSEC contends that it only bargained for the DCS—not the steam turbine—and that the turbine must therefore constitute "other property."[31] Pl.'s Resp., at 13. Through their argument,

---

[31] At the hearing, GSEC also argued that because the DCS resides in a completely separate area of its facility from Unit 3, the DCS must also necessarily constitute "other property" bargained for separately. This argument ignores the fact that the DCS is intimately connected to the operation of the Unit 3 turbine, which could not function without its

GSEC endeavors to distinguish the facts of this case from the holdings in cases like *Equistar* and *Lopez*, where the courts held that plaintiffs could not recover for damages to finished products caused by component parts that the plaintiffs had installed into the product. *See id.* at 13–14. GSEC too narrowly reads the holdings in these cases. The fact that "[t]he turbine and DCS [are] separate pieces of property arising out of separate bargains negotiated at separate times" (*id.* at 20 (emphasis in original omitted)) is not controlling for the purpose of Texas's "benefit of the bargain" test. Instead, this court will follow the broader—and what it believes to be the correct—construction articulated by federal and Texas courts, and apply the "object of the bargain" standard by considering not only the actual product bargained for, but also the ultimate use and purpose of the integrated product as contemplated by the contract (contractual expectancy), and whether the eventual damage was foreseeable at the time of bargaining. *See, e.g., TEU Servs.*, 2018 WL 3338217, at *5 ("The proper unit of analysis is the integrated product, not the individual components."); *Lopez*, 490 S.W.3d at 524–25 (concluding because plaintiff's "claim [was] for damage to a finished product caused by a defective component, there [was] no damage to 'other property,'" where damage to finished product was reasonably foreseeable and damages were only economic); *Equistar*, 123 S.W.3d at 588–89 (quoting *Sea-Land*, 134 F.3d at 154) (holding plaintiff could not recover in tort for damages to compressors caused by replacement impellers in part because damage was foreseeable); *see also Statia Terminals*, 1998 WL 560358, at *41 (explaining that the object of the bargain test is a "sophisticated determination and not merely a mechanistic determination of whether the injuring components and the damaged property were sold under the umbrella of the same contract").

---

"brain"—the DCS.  In other words, the physical location of the DCS is insignificant compared to its purpose or function.

As GSEC implicitly acknowledges, the DCS (whether manufactured by Emerson or another company) is a necessary component of Unit 3, without which the steam turbine could not operate. *See* Pl. App., at 2 (Aff. of J. Jolly Hayden, at 2 ¶ 9) (explaining that "[t]he steam turbine can be paired with any number of control systems," but making no assertion that the steam turbine can operate without a control system). The DCS is like the ballcocks in *Sanitarios Lamosa* or the LED drivers integrated into the exterior light fixtures in *TEU Servs.*—a component installed into a completed product (turbine). The court sees no reason to conclude otherwise simply because GSEC is not reselling the turbine but is instead using the completed product for its own use. Although GSEC may have purchased the Emerson DCS separately from the steam turbine, the object of its bargain was a fully-functioning Unit 3—not merely the purchase of an updated control system. Standing alone, the DCS had no use or purpose to GSEC. Because the DCS is intimately connected to the operation of the steam turbine, the court finds that the DCS is merely one component part, albeit a significant one, of Unit 3—the whole, integrated product.

Having determined that the DCS constitutes a component part, the court must also conclude that the turbine does not amount to "other property." To hold that the DCS is an independent part separately bargained for and the turbine is "other property" would contravene Texas law. Indeed, the facts of this case fit squarely within the holdings of Texas and federal courts that "have rejected the argument that damage to a finished product caused by a defective component part constitutes damage to 'other property,' so as to permit tort recovery for damage to the finished product."[32]

---

[32] GSEC attempts to distinguish *Lopez* (and cases with similar holdings such as *Helen of Troy*), arguing that "masa contemporaneously packaged in plastic forming a finished food product whereby the two become integrated, is completely different than a control system used at an industrial power plant purchased some 14 years after the plant and turbine at issue began commercial operation." Pl.'s Resp., at 19–20. The court does not find, however, that the type of product (food versus a power plant) or the timing of the integration (contemporaneously versus after-the-fact) to be the key focus of the Texas benefit of the bargain test. Instead, the courts look not only to the object of the parties' bargain, but also to whether the damage was foreseeable and the type of loss plaintiff suffered to help determine whether the item at issue—here, the steam turbine—constitutes "the product" or "other property."

*Lopez*, 490 S.W.3d at 522 (quoting *Pugh*, 243 S.W.3d at 92); *see, e.g., Helen of Troy*, 511 F. Supp.

2d at 722 (holding that plaintiff could not recover in tort for damages to finished product caused

by component part); *Sanitarios*, 2005 WL 2405923, at *6 (same); *Equistar*, 123 S.W.3d at 589–

90 (same); *Alcan*, 133 F. Supp. 2d at 505 (same).  Accordingly, GSEC's tort claims to the turbine

are precluded by the ELR.

### b.   Damages were foreseeable and the injury is purely economic.

Similarly, the fact that the damages to the turbine were foreseeable and GSEC's claimed

damages are purely economic leads this court to conclude that the ELR applies to GSEC's tort

claims.  The DCS "is the control interface for all engagement and control functions of the steam

turbine . . . ." Def. App., at 2 (Decl. of Glen Wagner).  As such, it is foreseeable that a malfunction

in the DCS software could damage the steam turbine, which is directly controlled by the DCS.[33]

*Id.*; *see Lopez*, 490 S.W.3d at 524 ("In the context of this commercial transaction, damage to the

[final product] could be reasonably contemplated by [plaintiff] and [defendant] in the event the

[components] were defective."); *see also Alcan*, 133 F. Supp. 2d at 505 (noting that damage to

completed product by component part "was certainly foreseeable, and the parties are sophisticated

entities capable of protecting themselves in the contracting process").  Moreover, GSEC's only

claimed injury is economic loss related to repair costs to the product itself—Unit 3's steam turbine.

*See* Pl.s' First Am. Compl., at 12.  GSEC does not allege any physical injury to other property or

persons. *See id.*

---

[33] Indeed, GSEC impliedly admits the damage to the turbine was foreseeable. *See* Pl.'s Resp., at 22–23. Although GSEC avoided stating directly that the damage was foreseeable (instead, attributing the foreseeability statement to Emerson), its contention that the damage to the turbine amounts to direct damages necessarily incorporates an argument that the damage was foreseeable. *See id.* at 22 (contending damages sought are direct and defining direct damages as those that "have been foreseen or contemplated by the defendant").

### c. Policy dictates that GSEC may only pursue a warranty claim.

Finally, the Texas Supreme Court's rationales for adopting the ELR likewise counsel this court to conclude that GSEC's tort and strict liability claims are governed by warranty law. GSEC and Emerson are sophisticated entities, familiar with managing the risks involved in a transaction and negotiating a contract that fairly assigns those risks. *See LAN/STV*, 435 S.W.3d at 240. GSEC's claim—an economic loss exceeding $8 million—is "especially well suited to allocation by contract." *Id.* (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c); *see also East River*, 476 U.S. at 873 ("Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements."). Here, GSEC and Emerson negotiated warranties and liability limits of their choosing, and presumably adjusted the purchase price accordingly. In addition, the record also irrefutably demonstrates that GSEC procured insurance to protect itself from most, if not all, of the claimed loss. Such circumstances fall squarely within the criteria outlined by the Texas Supreme Court in *LAN/STV* and *Sharyland* for allowing the parties to have "a full chance to consider how to manage the risks involved, whether by inspecting the item or investment, obtaining insurance against the risk of disappointment, or making a contract that assigns the risk of loss to someone else," rather than having a court permit tort recovery for such economic loss. *See LAN/STV*, 435 S.W.3d at 240–41 (quoting *Restatement (Third) of Torts: Liability for Economic Harm* § 1 cmt. c); *see also Equistar*, 123 S.W.3d at 590 (citing *East River*, 476 U.S. at 873) ("The rule is based on the proposition that commercial parties may negotiate for whatever warranty or liability limits they choose, and adjust their price accordingly."). This court sees "no reason to intrude into the parties' allocation of the risk." *East River*, 476 U.S. at 873.

Moreover, GSEC's alleged damage—strictly economic loss—is not the type of injury negligence or strict liability law is intended to remedy. *See Mid Continent*, 572 S.W.2d at 312 (quoting W. Page Keeton, 32 S.W.L.J. 1, 5 (1978)) (explaining that tort law seeks to protect against harm to persons and other property). As the United States Supreme Court explained in *East River*, "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *East River*, 476 U.S. at 871; *see also Mid Continent*, 572 S.W.2d at 311 (noting that strict liability applies to claims involving "personal injuries resulting from unreasonably dangerous products" and "[p]hysical injuries to a consumer's other property" but not for injury to the product itself). As the court has already discussed, GSEC has not alleged damage to any "other property"; the damage is solely to the integrated product itself, and GSEC's claimed injuries are purely economic. Where "damage occurs only to the product that passed between them, the claim is one for economic loss and must be brought on the parties' contract." *Equistar*, 123 S.W.3d at 587 (citing *Nobility Homes*, 557 S.W.2d at 80). Accordingly, GSEC's economic loss is more appropriately remedied through contract law. *Mid Continent*, 572 S.W.2d at 313 ("Distinguished from personal injury and injury to other property, damage to the product itself is essentially a loss to the purchaser of the benefit of the bargain with the seller."); *see also East River*, 476 U.S. at 870 ("Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain— traditionally the core concern of contract law."); *Equistar*, 123 S.W.3d at 589–90 (opining that if replacement component parts "escape[d] the reach of the economic loss rule, then tort law would create new and expanded liabilities long after any negotiated warranty had expired").

For all of these reasons, the court concludes that the Unit 3 steam turbine, with the integrated DCS, is the whole product, and any damage to it does not constitute damage to "other property" under Texas law. GSEC's tort claims, asserted under either negligence or strict liability theories, are therefore barred by the ELR. Accordingly, the court should **GRANT** Emerson's motion for summary judgment as to all GSEC's tort claims.[34]

## IV.     Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that the United States District Court **GRANT** Defendant's Motion for Summary Judgment (ECF No. 71). The undersigned further **RECOMMENDS** that the District Court **DENY as moot** Defendant's "Motion *in Limine* to Exclude Evidence of Other Incidents" (ECF No. 89) and "*Daubert* Motion to Exclude the Testimony of James Hawks" (ECF No. 90).

## V.     Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that

---

[34] Based on this finding, the court need not address any other ground raised in Emerson's motion for summary judgment or GSEC's response thereto, including the legal interpretation or consequence of the contract's damages cap. The court's finding would similarly bar any claim by GSEC that it suffered damages beyond economic losses, i.e., from a duty imposed by law and independent of the contract, because "the subject matter of th[e] dispute is the [alleged] defective nature" of the DCS provided by Emerson under its contract with GSEC, and the "damages . . . incurred flowed from that contract." *U.S. Steel Corp.*, 2018 WL 911861, at *2–4 (rejecting plaintiff's argument that ELR did not bar negligence claims based on claimed duty independent of contract, where nature of the loss was only to the subject, or expectancy, of the contract itself).

merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: November 19, 2018

_____
**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**